Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/14/2018 09:08 AM CDT

State of Nebraska, appellee, v.
Kevin W. Malone, appellant.
___ N.W.2d ___

Filed July 24, 2018.    No. A-17-726.

1. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Pleadings: Directed Verdict.** A motion for judgment of acquittal is simply another name for a motion for directed verdict of acquittal.

5. **Directed Verdict: Waiver.** Where a defendant makes a motion for a directed verdict at the end of the State's case, whether ruled upon or not, and the defendant thereafter presents evidence, the defendant has waived any error in connection with the motion for directed verdict made at the end of the State's case.

6. **Criminal Law: Pleadings: Directed Verdict.** A motion for judgment of acquittal is a criminal defendant's request, at the close of the government's case or the close of all evidence, to be acquitted because there is no legally sufficient evidentiary basis on which a reasonable jury could return a guilty verdict.

7. **Motions to Dismiss: Directed Verdict.** A motion to dismiss at the close of all the evidence has the same legal effect as a motion for directed verdict.

8. **Pleadings: Motions to Dismiss: Directed Verdict.** Whether styled as a motion for judgment of acquittal, motion for directed verdict, or motion to dismiss, these motions all have the same effect when used to challenge the sufficiency of the State's evidence at the conclusion of the State's case or the conclusion of the evidence.

9. **Witnesses: Juries: Appeal and Error.** The credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review.

10. **Convictions: Appeal and Error.** In determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within the jury's province for disposition.

11. **Criminal Law: Motor Vehicles: Words and Phrases.** Recklessness, for purposes of Neb. Rev. Stat. § 60-6,213 (Reissue 2010), has been defined as the disregard for or indifference to the safety of another or for the consequences of one's act.

12. **Sentences.** When imposing a sentence, the sentencing court should customarily consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. However, the sentencing court is not limited to any mathematically applied set of factors.

13. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

William F. McGinn, of McGinn, Springer & Noethe, P.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

Pirtle, Riedmann, and Bishop, Judges.

Pirtle, Judge.

## INTRODUCTION

Kevin W. Malone appeals his convictions and sentences for motor vehicle homicide and manslaughter in the district court for Douglas County. He argues that the evidence was insufficient to support guilty verdicts on the charges and that his sentences are excessive. Based on the reasons that follow, we affirm.

## BACKGROUND

On March 10, 2017, Malone was charged by an amended information with count 1, motor vehicle homicide, a Class II felony; count 2, manslaughter, a Class IIA felony; count 3, leaving the scene of a personal injury accident resulting in serious bodily injury or death, a Class III felony; and count 4, driving without an ignition interlock device, a Class I misdemeanor. The charges arose from a traffic accident in which Malone's car collided with Justin Hart's motorcycle, resulting in Hart's death. Malone pled not guilty to all four charges.

A jury trial began on May 1, 2017. The evidence at trial was as follows: On August 31, 2016, at approximately 7:25 p.m., Malone was traveling eastbound on West Center Road in Omaha, Nebraska, in a black Nissan 350Z sports car when he pulled into the left-hand turn lane to turn north onto 140th Street. The traffic light controlling Malone's lane displayed a red arrow, which meant Malone was not allowed to turn. Hart was traveling westbound on West Center Road and had a green traffic light. With his light still red, Malone pulled into the nearest westbound lane of West Center Road to turn left, just as Hart was approaching the intersection on his motorcycle. Hart applied his brakes and tried to "lay his bike down" to avoid the collision but was unsuccessful. Hart collided with the rear passenger's side of Malone's car and was ultimately separated from his motorcycle. Hart landed face down on the road, approximately 6 feet from Malone's car, and Hart's motorcycle landed in the median between the eastbound lanes

and the left-hand turn lane. Hart sustained massive internal injuries during the collision and was declared dead after he arrived at a hospital. His cause of death was "blunt trauma to the head, chest, and abdomen."

The accident was witnessed by several individuals, some of whom attempted to render aid to Hart. An off-duty paramedic and an individual who was a respiratory therapist began administering CPR. The off-duty paramedic observed blood coming out of Hart's mouth with each compression, and he was unable to find a pulse.

As the two individuals were administering CPR to Hart, Malone exited his car and walked over to their location. He knelt down next to Hart's body and started to perform "mouth-to-mouth," which struck the off-duty paramedic as odd, given the amount of blood coming from Hart's mouth. Both the off-duty paramedic and the respiratory therapist told Malone to stop, but he did it a second time. Malone then wiped off his mouth, slowly stood up, and walked away.

By this time, several people had called the 911 emergency dispatch service, and both fire department and police department employees were on their way to the scene. In addition, several witnesses, including Karla Villatoro, were trying to identify the driver of the Nissan. As Villatoro was looking for identification inside the Nissan, Malone walked around the rear of the Nissan and picked up some car parts off the ground and placed them in the back seat of the car. Villatoro asked Malone if the car belonged to him, and he replied that it did. Malone then got into the driver's seat, and Villatoro asked him what he was doing. Malone told her he was going to move his car out of the way. Villatoro instructed Malone to move his car to a certain place and to stay there.

Malone fumbled with his keys as he placed them in the ignition. After he started the car, he began to move it while holding the driver's side door open with his arm and his foot hanging out of the car. Malone drove a short distance and stopped briefly, but then started driving again and left

the scene of the accident. Malone's car was smoking as he drove away.

Officer Stephen Venteicher of the Omaha Police Department arrived on the scene moments later, and several people told him that the driver of the car involved in the collision "just took off." Venteicher made contact with Villatoro, who described the car and told him the direction Malone was headed. Venteicher activated his emergency lights and initiated a pursuit.

After Venteicher began his pursuit, he saw a white cloud of smoke dissipating in the air. He followed the trail of smoke, which led him into a residential neighborhood. He soon observed that the Nissan was in front of him and that it was swerving as it drove down the road. Venteicher activated his sirens, in addition to the emergency lights which had already been activated. Malone slowed down and stayed to the right but did not stop. Venteicher then pulled up next to the driver's side door and "screamed" at Malone to pull over and stop. Malone did not appear startled, but, rather, rolled his head slowly to the left toward Venteicher and then slowly back to the right before finally bringing his car to a stop.

Venteicher parked next to the Nissan, and Malone immediately said, "I just thought it would be best if I got my car home." Venteicher removed Malone from the car, placed him face down on the ground, and handcuffed him. When Venteicher requested identification, Malone said his license was in his wallet. Venteicher retrieved Malone's wallet and identified him by an ignition interlock permit. Notably, there was no ignition interlock device installed on the Nissan. Venteicher also discovered that the license plates on the Nissan were expired. Venteicher then advised dispatch that he had the suspect in custody.

While Malone was still lying on the ground, he repeatedly stated, "[H]e just came out of nowhere. I tried to help, but I just thought it would be best to get my car home." Venteicher helped Malone to his feet and noticed that he had blood on his

hands, his shirt, and his chin. As Malone explained that the blood belonged to the motorcycle driver, Venteicher detected a faint odor of alcohol on Malone's breath and noticed his eyes were watery and his speech was mumbled. Venteicher, who had been a police officer for 25 years and had conducted more than 1,000 driving under the influence (DUI) investigations, suspected Malone may be impaired and decided to begin a DUI investigation. Venteicher asked Malone if he had been drinking, and Malone admitted that he had consumed two beers earlier in the day.

Following some preliminary questions, Venteicher administered a series of field sobriety tests to Malone. Malone was able to correctly recite the alphabet when asked, but his speech was mumbled. Malone showed signs of impairment on the remaining tests. Specifically, four out of six clues or indicators on the horizontal gaze nystagmus (HGN) indicated impairment, Malone was unable to count backward from 92 to 78, he was unable to touch his nose with his fingertip, six of eight clues on the nine-step walk-and-turn indicated impairment, and Malone failed to follow instructions on the "Romberg" balance test. In addition, Venteicher noted Malone was swaying slightly during both the finger-to-nose test and the balance test. Based on his observations, Venteicher concluded Malone was impaired to the extent that he could not safely operate a motor vehicle.

Shortly after Venteicher finished administering the field sobriety tests to Malone, Officer Matthew Kelly, of the Omaha Police Department, arrived. Like Venteicher, Kelly had conducted more than 1,000 DUI investigations during his 25-year career as a police officer. In addition, he was a certified drug recognition expert (DRE) and had conducted approximately 150 DRE examinations. After speaking to Venteicher, Kelly made contact with Malone. Kelly asked Malone if he had taken any drugs, and Malone stated he was taking a prescription drug called Celexa. He also admitted that he had consumed two beers earlier in the day.

Kelly administered the HGN test to Malone and observed the same four clues as Venteicher, which suggested to Kelly that Malone could be under the influence of a central nervous system depressant (CNSD), an inhalant, or a dissociative anesthetic. Kelly decided to transport Malone to Douglas County Corrections to conduct a DRE examination.

Upon arrival at Douglas County Corrections, Malone agreed to submit to the DRE examination and provide a urine sample. He also submitted to a chemical breath test, which showed he did not have any alcohol in his system. Kelly again questioned Malone about any prescription drugs he was taking. Malone stated he was taking Celexa, as well as medications for high blood pressure and depression.

Kelly then began the 12-step DRE examination. Malone displayed several signs indicative of impairment, including the same four out of six clues on the HGN that he had seen when Malone did the test earlier, lack of convergence (i.e., he was unable to cross his eyes), four out of eight clues on the walk-and-turn test, two out of four clues on the one-leg stand, and an inability to accurately touch his nose with his fingertip (missing three out of six attempts). Malone did not show any signs of impairment on the balance test. Malone's blood pressure and pulse rates were also elevated, and his pupils were dilated. His muscle tone appeared normal.

Based on Malone's driving behavior and his performance during the DRE examination, Kelly concluded that Malone was under the influence of a CNSD and cannabis and that he was impaired to an extent he was unable to safely operate a motor vehicle. Kelly stated that Malone's driving behavior that indicated impairment included the following: his claim that his light was green, which was not possible based on the cycle of the light; the fact that Malone left the scene to get his car home; and Malone's actions at the scene. The indicators from the field sobriety tests that led Kelly to conclude that Malone was under the influence of a CNSD were Malone's HGN test results, his lack of convergence, and his performance on the divided

attention tests (walk-and-turn, one-leg stand, and finger-to-nose test). The indicators for cannabis included Malone's lack of convergence, dilated pupils, and elevated blood pressure and pulse rates. Kelly also noted that some antidepressants can elevate a person's pulse rate and cause dilated pupils.

At the conclusion of the DRE examination, Kelly collected a urine sample from Malone and sent it to the Nebraska State Patrol crime laboratory for testing. Malone's urine tested positive for four different CNSD's, but negative for cannabinoids. The CNSD's present in Malone's urine were zolpidem (also known as Ambien), diphenhydramine (also known as Benadryl), clonazepam (also known as Klonopin), and citalopram (also known as Celexa). When asked about the absence of cannabinoids in Malone's urine, Kelly again explained that some antidepressants can cause elevated pulse rates and blood pressure, as well as dilated pupils, similar to the effects of cannabinoids. In addition, Kelly testified that the presence of multiple drugs in a person's system can have an "additive effect," meaning the drugs can interact in ways that enhance impairment. In this case, Malone had four CNSD's in his urine and admitted to drinking alcohol, which is also a CNSD.

At the close of the State's evidence, Malone made a motion for judgment of acquittal, alleging the State had not made a prima facie case against him. The trial court denied the motion.

Malone testified in his own defense. He admitted that the accident was his fault but denied that he was impaired when he was driving. He questioned the accuracy of Venteicher's and Kelly's testimony about his performance on the field sobriety tests. Malone also testified that after the accident, he tried to help Hart by doing mouth-to-mouth resuscitation. He also testified that when he got back in his car after the accident, he was just going to move it out of the way, but then he panicked and drove off.

Malone stated that he had another vehicle at his home equipped with an ignition interlock device, which device he

was required to have in order to drive. He testified that on the day of the accident, he was driving the Nissan because he was taking it to a carwash to have it cleaned so he could try to sell it.

Malone offered into evidence the labels from his prescriptions for zolpidem, citalopram, and clonazepam, all of which carried the same warning: "May cause drowsiness. Alcohol may intensify this effect. Use care when operating a vehicle, vessel (e.g., boat), or machinery."

Malone also offered the testimony of a professor of pathology, who testified that urine testing alone cannot prove that a drug is present in a person's bloodstream or in what amount. He explained that the amount of drugs in a person's urine does not have a correlation to the amount of drugs in the bloodstream. He also testified that the presence of a drug in urine does not prove that the drug caused the person to be impaired. He acknowledged on cross-examination that field sobriety tests and DRE examinations are valid methods for determining whether a person is impaired by drugs.

At the conclusion of all the evidence, Malone again made a motion for judgment of acquittal, which motion the trial court denied. The case was submitted to the jury, and it returned verdicts of guilty on all four counts. The district court accepted the jury's verdicts and adjudged Malone guilty of the offenses.

Malone's sentencing hearing was held on June 28, 2017. The State offered a certified copy of Malone's conviction for DUI, third offense, into evidence. The district court found the conviction valid for enhancement purposes, making Malone's conviction for motor vehicle homicide a Class II felony.

The district court then sentenced Malone to 40 to 50 years' imprisonment on count 1, 20 to 20 years' imprisonment on count 2, 4 years' imprisonment on count 3, and 1 year's imprisonment on count 4. The district court ordered the sentences to run concurrently and also revoked Malone's driver's license for 15 years.

## ASSIGNMENTS OF ERROR

Malone assigns, restated, that the trial court erred in (1) denying his motion for directed verdict at the conclusion of the State's evidence and failing to grant a judgment of acquittal at the close of his case on counts 1 and 2 and (2) imposing excessive sentences.

## STANDARD OF REVIEW

[1] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

[2,3] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

*Motion for Directed Verdict*
*and Judgment of Acquittal.*

[4] Malone assigns that the trial court erred in overruling his motion for directed verdict at the conclusion of the State's evidence and failing to grant a judgment of acquittal at the close of all the evidence on counts 1 and 2. At the close of the State's evidence, Malone motioned for a judgment of acquittal, rather than a directed verdict, as he refers to in his assignment of error. However, a motion for judgment of

acquittal is simply another name for a motion for directed verdict of acquittal. *State v. Combs*, 297 Neb. 422, 900 N.W.2d 473 (2017).

[5-8] Malone has waived error in relation to the ruling on a directed verdict by presenting evidence after his motion. See *State v. Burke*, 23 Neb. App. 750, 756, 876 N.W.2d 922, 928 (2016), citing *State v. Rodriguez*, 6 Neb. App. 67, 569 N.W.2d 686 (1997) ("'where a defendant makes a motion for a directed verdict at the end of the State's case, whether ruled upon or not, and the defendant thereafter presents evidence, the defendant has waived any error in connection with the motion for directed verdict made at the end of the State's case'"). However, Malone may proceed on his failure to grant a judgment of acquittal at the close of all the evidence assignment of error, as that is essentially a sufficiency of the evidence argument. A motion for judgment of acquittal is "'[a] criminal defendant's request, at the close of the government's case or the close of all evidence, to be acquitted because there is no legally sufficient evidentiary basis on which a reasonable jury could return a guilty verdict.'" *State v. Combs*, 297 Neb. at 429, 900 N.W.2d at 480, quoting Black's Law Dictionary 1170 (10th ed. 2014). As previously stated, a motion for judgment of acquittal is simply another name for a motion for directed verdict of acquittal. *Id.* And a motion to dismiss at the close of all the evidence has the same legal effect as a motion for directed verdict. *Id.* Thus, whether styled as a motion for judgment of acquittal, motion for directed verdict, or motion to dismiss, these motions all have the same effect when used to challenge the sufficiency of the State's evidence at the conclusion of the State's case or the conclusion of the evidence. *Id.*

Malone first argues that the evidence was insufficient to convict him of motor vehicle homicide. A person commits motor vehicle homicide when he or she causes the death of another unintentionally while engaged in the operation of a motor vehicle in violation of the law of the State of Nebraska

or in violation of any city or village ordinance. Neb. Rev. Stat. § 28-306(1) (Reissue 2016). Pursuant to § 28-306(3)(c), if the proximate cause of the death of another is the operation of a motor vehicle in violation of Neb. Rev. Stat. § 60-6,196 (Reissue 2010) (operating motor vehicle while under influence of alcoholic liquor or drugs) or Neb. Rev. Stat. § 60-6,197.06 (Cum. Supp. 2016) (operating motor vehicle during revocation period), motor vehicle homicide is a Class II felony if the defendant has a prior conviction for a violation of § 60-6,196 or § 60-6,197.06.

[9,10] The State had to prove that Malone was engaged in the operation of a motor vehicle while under the influence of alcoholic liquor or drugs and that his operation of the motor vehicle while under the influence of alcoholic liquor or drugs was the proximate cause of Hart's death. Malone argues that the evidence was insufficient to show that he was under the influence of alcohol or drugs at the time of the collision. He contends that the testimony of Venteicher and Kelly was inconsistent and unreliable, or in other words, that their testimony was not credible. However, it is well established that the credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review. *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009). Moreover, in determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are within the jury's province for disposition. *State v. Hudson*, 268 Neb. 151, 680 N.W.2d 603 (2004).

Venteicher and Kelly were both experienced police officers, and they individually administered field sobriety tests to Malone. They both observed multiple signs indicative of impairment, and both concluded Malone was impaired.

After Venteicher stopped Malone and removed him from his car, Venteicher suspected that Malone may be impaired

because there was a faint odor of alcohol on his breath, his eyes were watery, and his speech was mumbled. After Malone admitted he had consumed two beers earlier in the day, Venteicher administered a series of field sobriety tests to Malone. Malone correctly recited the alphabet, although his speech was mumbled, but showed signs of impairment on the remaining tests. Malone was also swaying slightly during two of the tests. Venteicher concluded Malone was impaired to an extent that he could not safely operate a motor vehicle.

Kelly, a certified DRE, made contact with Malone after Venteicher conducted his field sobriety tests. Malone told Kelly he was taking a prescription drug called Celexa and admitted to consuming two beers earlier in the day. Kelly administered the HGN, and he observed the same four clues of impairment that Venteicher had observed, which suggested to him that Malone could be under the influence of a CNSD, an inhalant, or one of the "dissociative anesthetics."

Kelly subsequently conducted a full DRE examination and had Malone provide a urine sample. When asked about prescription medication, Malone stated he was taking medication for high blood pressure, as well as Celexa and another antidepressant. During the DRE examination, Malone showed several signs indicative of impairment. His blood pressure and pulse rate were also elevated and his pupils were dilated. Based on Malone's driving behavior and his performance during the DRE examination, Kelly concluded that Malone was under the influence of a CNSD and cannabis and that Malone was unable to safely operate a motor vehicle.

Malone's urine sample tested positive for four CNSD's, but negative for cannabinoids. Kelly explained that some antidepressants can cause symptoms similar to those caused by cannabinoids. He also testified multiple drugs in a person's system can have an "additive effect," thereby enhancing impairment.

Malone's own witness, the professor of pathology, acknowledged on cross-examination that field sobriety tests and DRE

examinations are valid methods for determining whether a person is impaired by drugs.

The testimony of Venteicher and Kelly, as well as Malone's behavior after the accident, was sufficient evidence to support a finding that Malone was under the influence of drugs at the time of the collision with Hart. We conclude the evidence was sufficient to support Malone's conviction for motor vehicle homicide.

Malone also argues that the evidence was insufficient to convict him of manslaughter. "A person commits manslaughter if he or she . . . causes the death of another unintentionally while in the commission of an unlawful act." Neb. Rev. Stat. § 28-305 (Reissue 2016). The alleged unlawful act was reckless driving. Malone contends that the evidence failed to show that he recklessly operated a motor vehicle.

[11] Reckless driving occurs when any person drives a motor vehicle in such a manner as to indicate an indifferent or wanton disregard of the safety of persons or property. See Neb. Rev. Stat. § 60-6,213 (Reissue 2010). Recklessness, for purposes of § 60-6,213, has been defined as the disregard for or indifference to the safety of another or for the consequences of one's act. See *State v. Green*, 238 Neb. 475, 471 N.W.2d 402 (1991).

Malone argues that the evidence fails to show that he acted with disregard or indifference for the safety of others. He contends that he was not speeding, not driving erratically, and did not "blow through" the traffic signal. Brief for appellant at 12. Rather, the evidence showed that he had stopped at the intersection and "slowly inched his vehicle into the intersection looking for an opportunity to turn." *Id.* Malone acknowledged that he violated a traffic law by turning left when the traffic light for his lane was red, but stated that he mistakenly "thought he had the green light to turn and was observing the traditional right of way rule." *Id.*

Malone drove his car while impaired by his medication, and he disregarded a red light—turning into oncoming traffic

and causing a collision resulting in Hart's death. However, the evidence also established that Malone chose to drive a motor vehicle which he was not authorized to drive because it was not equipped with an ignition interlock device. He had another vehicle at his home equipped with an ignition interlock device. He also disregarded the warning labels on his prescription medications, all of which warned that they may cause drowsiness, that alcohol may intensify the effect, and that care must be taken when operating a motor vehicle. We conclude that the evidence was sufficient for the jury to conclude that Malone's conduct was "reckless," and thereby sufficient to support his conviction for manslaughter.

*Excessive Sentences.*

Malone next argues that his sentences for counts 1 and 2 are excessive. The court sentenced Malone to 40 to 50 years' imprisonment for the motor vehicle homicide conviction and 20 to 20 years' imprisonment for the manslaughter conviction, with the sentences to run concurrently. Motor vehicle homicide is a Class II felony, punishable by a maximum sentence of 50 years' imprisonment and a minimum sentence of 1 year's imprisonment. § 28-306(3)(c); Neb. Rev. Stat. § 28-105 (Reissue 2016). Manslaughter is a Class IIA felony, punishable by a maximum of 20 years' imprisonment, with no minimum sentence. § 28-305; § 28-105. The sentences imposed by the district court were within the statutory limits. An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017).

Malone argues that the court abused its discretion in sentencing because it had a personal bias against him. At the sentencing hearing, the court discussed that it had previously sentenced Malone to probation for DUI, third offense. The court stated that the presentence investigation at that time did not include all the specifics of Malone's prior DUI's and that if it had, the court would have likely sentenced him differently.

The court stated that the presentence investigation before it in this case included all the specifics of his past crimes. The court further addressed Malone's past behavior and his continuous effort to make excuses for himself rather than taking responsibility for his actions.

[12,13] When imposing a sentence, the sentencing court should customarily consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. However, the sentencing court is not limited to any mathematically applied set of factors. *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Although the court discussed Malone's past criminal history and behavior at sentencing, it did not take anything inappropriate into consideration nor does that record indicate any bias against Malone that affected sentencing. The court stated that it had reviewed the presentence investigation and that it had considered the above-mentioned factors. We conclude that the trial court did not abuse its discretion in the sentences it imposed for the motor vehicle homicide and manslaughter convictions.

## CONCLUSION

We conclude that there was sufficient evidence to support guilty verdicts on the charges of motor vehicle homicide and manslaughter and that the sentences for these convictions are not excessive. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.