Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/19/2021 09:07 AM CST

**State of Nebraska, appellee, v.
Abram K. Sollman, appellant.**

___ N.W.2d ___

Filed January 12, 2021.    No. A-20-172.

1. **Motions to Dismiss: Directed Verdict.** A motion to dismiss at the close of all the evidence has the same legal effect as a motion for directed verdict.

2. **Criminal Law: Motions to Dismiss: Evidence.** In determining whether a criminal defendant's motion to dismiss for insufficient evidence should be sustained, the State is entitled to have all of its relevant evidence accepted as true, the benefit of every inference that can reasonably be drawn from the evidence, and every controverted fact resolved in its favor.

3. **Criminal Law: Directed Verdict.** In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained.

4. **Rules of Evidence: Hearsay: Appeal and Error.** Excluding rulings under the residual hearsay exception, an appellate court reviews the factual findings underpinning a trial court's hearsay ruling for clear error and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.

5. **Constitutional Law: Motions to Suppress: Confessions: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts

meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

6. **Judgments: Trial: Evidence: Motions for New Trial: Sentences: Appeal and Error.** Evidentiary questions committed to the discretion of the trial judge, orders denying a motion for new trial, and claims of excessive sentencing are all reviewed for abuse of discretion.

7. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

8. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent the trial court's abuse of discretion.

9. **Criminal Law: Torts: Proximate Cause.** The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances.

10. **Proximate Cause.** As a general matter, to say one event proximately caused another is a way of making two separate but related assertions: First, it means the former event caused the latter; second, it means that it was not just any cause, but one with a sufficient connection to the result.

11. **Negligence: Proximate Cause.** The idea of proximate cause, as distinct from actual cause or cause in fact, is a flexible concept that generally refers to the basic requirement that there must be some direct relation between the injury asserted and the injurious conduct alleged.

12. ____: ____. A requirement of proximate cause serves to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.

13. **Negligence: Proximate Cause: Words and Phrases.** A "proximate cause" is a moving or effective cause or fault which, in the natural and continuous sequence, unbroken by an efficient intervening cause, produces a death or injury and without which the death or injury would not have occurred.

14. **Proximate Cause: Proof.** Three basic requirements must be met in establishing proximate cause: (1) that without the misconduct, the injury would not have occurred, commonly known as the "but for" rule; (2) that the injury was a natural and probable result of the misconduct; and (3) that there was no efficient intervening cause.

15. **Criminal Law: Negligence: Proximate Cause: Words and Phrases.** Criminal conduct is a proximate cause of the event if the event in question would not have occurred but for that conduct; conversely, conduct is not a proximate cause of an event if that event would have occurred without such conduct.

16. **Negligence: Proximate Cause.** An intervening cause supersedes and cuts off the causal link only when the intervening cause is not foreseeable.

17. **Negligence: Proximate Cause: Words and Phrases.** An efficient intervening cause is new and independent conduct of a third person, which itself is a proximate cause of the injury in question and breaks the causal connection between the original conduct and the injury. The causal connection is severed when (1) the negligent actions of a third party intervene, (2) the third party had full control of the situation, (3) the third party's negligence could not have been anticipated by the defendant, and (4) the third party's negligence directly resulted in injury to the plaintiff.

18. **Negligence: Proximate Cause: Tort-feasors: Liability.** The doctrine that an intervening act cuts off a tort-feasor's liability comes into play only when the intervening cause is not foreseeable. But if a third party's negligence is reasonably foreseeable, then the third party's negligence is not an efficient intervening cause as a matter of law.

19. **Negligence.** Foreseeable risk is an element in the determination of negligence, not legal duty. In order to determine whether appropriate care was exercised, the fact finder must assess the foreseeable risk at the time of the defendant's alleged negligence.

20. **Trial: Negligence.** The extent of foreseeable risk depends on the specific facts of the case and cannot be usefully assessed for a category of cases; small changes in the facts may make a dramatic change in how much risk is foreseeable. Thus, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter. And if the court takes the question of negligence away from the trier of fact because reasonable minds could not differ about whether an actor exercised reasonable care, then the court's decision merely reflects the one-sidedness of the facts bearing on negligence and should not be misrepresented or misunderstood as involving exemption from the ordinary duty of reasonable care.

21. **Evidence: Hearsay: Words and Phrases.** Hearsay statements are out-of-court statements made by a human declarant that are offered in evidence to prove the truth of the matter asserted.

22. **Drunk Driving: Blood, Breath, and Urine Tests: Proof.** The State is not required to prove a temporal nexus between the test and the defendant's alcohol level at the moment he or she was operating the vehicle.

23. ____: ____: ____. Matters of delay between driving and testing are properly viewed as going to the weight of the breath test results, rather than to the admissibility of the evidence.

24. **Drunk Driving: Blood, Breath, and Urine Tests: Time.** A valid breath test given within a reasonable time after the accused was stopped is probative of a violation.

25. **Constitutional Law: Criminal Law: Appeal and Error.** Harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result.

26. **Convictions: Appeal and Error.** It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside.

27. **Appeal and Error.** When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case.

28. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the jury actually rested its verdict. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

29. **Trial: Evidence: Verdicts: Appeal and Error.** In conducting harmless error analysis, an appellate court looks to the entire record and views the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt. Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless. An additional consideration is whether the improperly admitted evidence was cumulative and tended to prove the same point as other properly admitted evidence.

30. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

31. **Criminal Law: Convictions: Evidence: Appeal and Error.** When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

32. **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.

33. **Miranda Rights: Self-Incrimination: Evidence.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), requires law enforcement to give a particular set of warnings to a person in custody before interrogation, including that he or she has the right to remain silent, that any statement he or she makes may be used as evidence against him or her, and that he or she has the right to an attorney. These warnings are considered prerequisites to the admissibility of any statement made by a defendant during custodial interrogation.

34. **Miranda Rights.** *Miranda* warnings are required only when a suspect interrogated by the police is in custody.

35. ____. The ultimate inquiry for determining whether a person is in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is whether there is a formal arrest or restraint on freedom of movement of degree associated with a formal arrest.

36. ____. Custody under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is to be determined based on how a reasonable person in the suspect's situation would perceive his or her circumstances.

37. **Constitutional Law: Search and Seizure.** A seizure under the Fourth Amendment occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

38. **Miranda Rights.** In considering whether a suspect is in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), relevant considerations include, but are not limited to, the location of the interaction, who initiated the interaction, the duration of the interaction, the type and approach of questioning, the freedom of movement of the suspect, the duration of the interaction, and whether the suspect was placed under arrest at the termination of the interaction.

39. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

40. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. The sentencing court is not limited to any mathematically applied set of factors.

41. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed.

Thomas P. Strigenz, Sarpy County Public Defender, and Mitchell S. Sell, Senior Certified Law Student, for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

MOORE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Abram K. Sollman appeals his conviction of motor vehicle homicide, driving under the influence of alcohol (DUI), and reckless driving. He contends the district court erred in (1) overruling his motion to dismiss at the close of evidence and finding him guilty of count 1, because an efficient intervening cause destroys proximate cause; (2) overruling his hearsay objection to exhibit 5; (3) finding evidence beyond a reasonable doubt that he was guilty of count 2; (4) overruling his motion to dismiss at the close of evidence and finding him guilty of count 3; (5) overruling his motion to suppress the statements he made to law enforcement; and (6) imposing excessive sentences. For the reasons set forth herein, we affirm Sollman's convictions and sentences.

## II. STATEMENT OF FACTS

At about 6 p.m. on February 1, 2019, Sean Nowling was traveling westbound on Interstate 80 when "[a]ll of a sudden [he heard] honking of a horn like blaring" and a silver Volkswagen Jetta came "fl[ying] by [him] in the left lane . . . swerving back and forth through traffic," outpacing all other cars on the road and not using turn signals. Nowling later

saw the same Volkswagen, which he described as a "station wagon car" with "real fancy rims on it" and a Wisconsin license plate, with a door open at the "[Highway] 370 exit" where its driver had pulled over onto the side of the road and it appeared to Nowling as if the driver "was urinating on the side of the road."

After Nowling passed the silver Volkswagen, Nowling exited at the Gretna, Nebraska, off ramp before the Volkswagen came "flying by [him] on the shoulder up through three or four cars . . . in front of [him] . . . on the shoulder all the way through" and ran "the red light at the off ramp turn and Highway 31" toward Gretna. Nowling watched as the Volkswagen ran a second red light near a shopping mall, causing the vehicles in the area to quickly brake to avoid a collision. Nowling also observed the Volkswagen "swerv[e]," "whi[p] around," make a "U-turn," and "hea[d] back towards the [I]nterstate on Highway 31." Shortly thereafter, Nowling saw an "ambulance [and] sheriffs [and saw] Highway 31 was closed off."

Shortly thereafter, a Sarpy County sheriff's deputy, John Sanderson, arrived at the scene of the accident involving the silver Volkswagen and another vehicle, which accident had resulted in injuries to both drivers. Sollman was identified as the driver of the Volkswagen, and a Sarpy County sheriff's sergeant, Kyle Percifield, discovered a "small bottle of Fireball whisky . . . on the passenger side of [Sollman's] vehicle." Deputy Sanderson smelled alcohol emanating from Sollman as Sollman was being transported on a stretcher to a "life flight" helicopter and taken to the University of Nebraska Medical Center (UNMC). The driver of the second vehicle, Cassandra Clausen, later died of blunt force trauma to her torso as a result of the accident.

After Deputy Sanderson smelled alcohol emanating from Sollman, he obtained a search warrant to obtain a DUI blood draw from Sollman. When Deputy Sanderson arrived at UNMC to execute the search warrant, he informed Sollman that he had a search warrant for a blood draw, went over the post-chemical-test advisements, and, during the same

conversation, asked Sollman if he had had anything to drink. Sollman responded that he "hadn't had anything to drink in 15 hours prior was his last drink." The results from the blood draw taken pursuant to the search warrant, which draw occurred approximately 3 hours after the accident, showed that Sollman's blood alcohol content was .125 plus or minus .01 grams of ethanol per 100 milliliters of blood.

The following day, Sergeant Percifield visited Sollman at UNMC and inquired about Sollman's recollection of the accident. Sollman stated that he had been traveling from Michigan to Lincoln and that "he didn't feel intoxicated" prior to the accident. Sergeant Percifield interviewed Sollman for a second time while Sollman was in jail and began by informing Sollman of the charges against him and the preliminary conclusions of the investigation into the accident. During this jail interview, Sollman responded that he thought the speed limit was 65 m.p.h. Sergeant Percifield acknowledged that he did not advise Sollman of his *Miranda* rights while interviewing Sollman at either the hospital or the jail.

In March 2019, Sollman was charged with motor vehicle homicide while under the influence of alcohol or drugs, a Class IIA felony under Neb. Rev. Stat. § 28-306(3)(b) (Reissue 2016) (count 1); DUI, a Class W misdemeanor under Neb. Rev. Stat. § 60-6,196 (Reissue 2010) (count 2); and reckless driving, a Class III misdemeanor under Neb. Rev. Stat. § 60-6,213 (Reissue 2010) (count 3). The information alleged that Sollman unintentionally caused Clausen's death while engaged in the unlawful operation of a motor vehicle, i.e., under the influence of alcohol beyond the legal limit.

### 1. Motion to Suppress

Prior to trial, Sollman moved to suppress statements he made to law enforcement at the scene of the February 1, 2019, accident and the following day while he was in the hospital, alleging the statements were obtained in violation of the 4th through 6th and 14th Amendments to the U.S. Constitution, as well as article I, §§ 7 and 12, of the Nebraska Constitution.

More specifically, Sollman asserted that the statements were obtained when he was hospitalized and in extreme pain and suffering; that he was not free to leave; that his statements were given neither freely nor voluntarily and were not made knowingly, understandingly, or intelligently; that he was not informed of his *Miranda* rights; and that his statements were a result of questions that law enforcement should have known were likely to elicit an incriminatory response.

At the suppression hearing, certain of the aforementioned facts that were relevant to Sollman's motion were admitted into evidence. Additional testimony was adduced from Deputy Sanderson and Sergeant Percifield.

### (a) Deputy Sanderson

When Deputy Sanderson executed the search warrant for a blood draw, he observed Sollman to be "conscious, alert, and talking"; believed Sollman knew who Deputy Sanderson was and what was going on; and noted Sollman was appropriately responsive to the questions posed to him. Deputy Sanderson acknowledged that he did not speak with hospital staff about Sollman's condition or about any medications given to Sollman prior to speaking with him; however, Deputy Sanderson reiterated that Sollman was "with it . . . able to hold a conversation," which Deputy Sanderson testified provided him with no indication that Sollman would be unable to coherently answer Deputy Sanderson's questions. Deputy Sanderson agreed that Sollman's condition likely prevented him from moving around the room or leaving at the time Deputy Sanderson spoke with him, but acknowledged that he did not know for sure. Deputy Sanderson noted that Sollman did not refuse to speak with him and did not ask for an attorney, but acknowledged that he did not advise Sollman of his rights.

Deputy Sanderson recalled that during his interaction with Sollman, he was standing "probably about five feet" from the foot of the bed; did not threaten Sollman, yell at him, or draw his weapon or display it at any point; and did not place Sollman under arrest or handcuff him.

### (b) Sergeant Percifield

Sergeant Percifield's first of two meetings with Sollman occurred at UNMC the day after the accident. Prior to questioning Sollman, Sergeant Percifield asked hospital staff about Sollman's condition and learned from Sollman that Sollman was on pain medication. Sergeant Percifield sought Sollman's consent to obtain Sollman's blood alcohol content result, and Sollman responded that Sergeant Percifield "could, and that [Sergeant Percifield] would get it anyway." Sergeant Percifield estimated that he conversed with Sollman "[a]bout 15 minutes" and noted that he was the only law enforcement officer present; did not display his weapon; and did not yell at or threaten Sollman. Despite Sollman's condition, Sergeant Percifield believed Sollman was "alert," was able to focus on the questions asked, and responded appropriately to questions. Sergeant Percifield also noted that Sollman never expressed a desire not to speak with him and never requested an attorney. However, Sergeant Percifield did not believe Sollman was able to freely move around or leave under his own strength.

### (c) Court's Order Regarding
### Motion to Suppress

Following the hearing, the district court denied Sollman's motion to suppress. The court specifically found that Sollman's statements were made voluntarily, explaining that Sollman was "attentive to the conversation"; that "his responses were clear, appropriate, and articulate"; that he was not in custody for purposes of invoking his *Miranda* rights; that his statement "'I thought it [the speed limit] was 65'" was admissible; and that Sergeant Percifield's discussion about how he calculated Sollman's speed was not intended to elicit any response.

### 2. Trial

A bench trial was held in December 2019. Stipulations were entered at trial, including that Clausen died of blunt force trauma to her torso received during the accident and that an exhibit containing a call to the 911 emergency dispatch

service was admissible. Additional evidence presented to the district court included testimony from Nowling, a witness to Sollman's erratic driving immediately prior to the accident as previously set forth; Deputy Sanderson; Shayna Hill, the phlebotomist who performed Sollman's DUI blood draw; forensic chemist Shanon Tysor; Sergeant Percifield; and a Nebraska State Patrol trooper, Andrew Phillips. Surveillance system video from a nearby business appeared to show Clausen's vehicle stop at the intersection and two cars pass before her vehicle entered the intersection, at which time it was struck by Sollman's vehicle.

### (a) Phlebotomist Hill

Hill testified that when Sollman was brought to the hospital, he was treated as a trauma patient, which included Hill's drawing a blood sample so Sollman's blood alcohol content could be analyzed. She explained that the materials used to collect a blood alcohol sample do not utilize alcohol and that once a sample has been obtained, she submits the sample to the laboratory for testing and later reviews the test results. Sollman's laboratory results obtained the night of the accident showed he had a blood alcohol content of .197 of a gram of alcohol per 100 milliliters of blood, which results were offered into evidence as exhibit 5. Hill identified exhibit 5, but Sollman objected on hearsay grounds, arguing exhibit 5 should not be received by the court, because Hill did not complete the testing on Sollman's blood sample. In response, the State argued that deficiencies in technique go to the weight and credibility but not the admissibility of the exhibit. Ultimately, the district court received exhibit 5 for the purpose of the blood alcohol content reading.

### (b) Deputy Sanderson

Deputy Sanderson provided some of the same testimony he gave at the suppression hearing, and counsel for Sollman renewed his objection based on his motion to suppress. In addition to the content of that previous testimony, Deputy

Sanderson noted that due to the "chaotic-ness" of the scene, he did not perform any field sobriety tests or give Sollman a preliminary breath test at the scene. Instead, Deputy Sanderson obtained a search warrant for a DUI blood draw. At 9:21 p.m., which was approximately 3 hours after the accident, Deputy Sanderson observed Hill remove two vials' worth of blood from Sollman.

### (c) Forensic Chemist Tysor

Tysor, a forensic chemist employed by the Douglas County sheriff's office, testified that she holds a Class A permit from the Nebraska Department of Health and Human Services and explained the permit is a license indicating she can process blood samples to determine alcohol concentration. Tysor stated that she tests blood samples for alcohol content monthly and performs approximately 50 to 60 tests annually. Tysor testified that she received a request from Deputy Sanderson to test Sollman's blood for alcohol and proceeded to test the blood sample in accordance with the specifications of title 177 of the Nebraska Administrative Code. Tysor further stated that all the scientific equipment was in proper working order. However, Tysor testified that the date or time the sample was collected was not included in her report. When Tysor was asked what the blood alcohol content of Sollman's sample was, Sollman objected based on foundation as to the chain of custody, but the court overruled the objection. Tysor reviewed the notes she took when testing Sollman's blood sample and testified the vial indicated that the sample had been collected on February 1, 2019, at 9:21 p.m. Tysor testified Sollman's blood alcohol content was .125 plus or minus .01 grams of ethanol per 100 milliliters of blood.

### (d) Sergeant Percifield

Sergeant Percifield testified that he has experience and training in investigating vehicle accidents and that as part of his investigation of the current accident, he recorded his interview with Sollman at the hospital. The district court received the

recording in evidence over Sollman's renewal of his motion to suppress.

Sergeant Percifield also investigated and took photographs of the vehicles involved in the accident. The photographs show the silver Volkswagen's Michigan license plate, number "EAC 7112," and Sergeant Percifield testified that they show the Volkswagen's tire imprint indicated the tires were larger than the manufacturer's recommended size. Sergeant Percifield explained that because the Volkswagen was equipped with larger tires, the speedometer underreported the vehicle's actual speed. Sergeant Percifield further testified that the Volkswagen's speedometer had stopped at approximately 76 m.p.h., which happens with older vehicles that are involved in an accident, but also acknowledged that a frozen speedometer is not definitive proof of the speed Sollman was going at the time of the accident.

Sergeant Percifield also used data from the airbag control module in Clausen's vehicle to corroborate speed calculations. Sergeant Percifield determined that at the time of the accident, Clausen was traveling at 14.93 m.p.h. and Sollman was traveling at approximately 72.49 m.p.h. Sergeant Percifield's investigation established that Clausen was at a stop sign when she failed to yield and turned left in front of Sollman onto Highway 31. Sergeant Percifield estimated that had Sollman been traveling at 55 m.p.h. rather than over 70 m.p.h., Clausen's vehicle would have cleared Sollman's lane of travel when he was 31 feet from the impact area. When asked hypothetically whether this accident would have occurred if both drivers had been sober, Sergeant Percifield stated that the accident might not have occurred, because reaction time is a factor considered during accident reconstruction. More specifically, Sergeant Percifield explained that a sober person might realize an obstruction is in the roadway and react to it more quickly than someone who was intoxicated. Sergeant Percifield opined that based on his calculations, the accident occurred because Sollman was traveling at around 72 m.p.h. in a 55-m.p.h.

zone, and that intoxication was a factor in the accident due to the slower reaction and perception of an impaired person. Sergeant Percifield explained that lack of tire marks attributable to Sollman's vehicle was evidence that his reaction to the impending crash was slowed.

Sergeant Percifield spoke to Sollman about the oversized tires on his vehicle and the speed calculations, and Sollman replied that he thought the speed limit was 65 m.p.h. Sollman renewed his motion to suppress by objecting to those statements.

Sergeant Percifield testified that text message data from Clausen's cell phone showed she received a text message near the time of the accident but did not indicate whether that message was viewed by Clausen, and Sergeant Percifield could not conclude whether that contributed to the accident. Sergeant Percifield also noted the incoming text message had the same time stamp as a crash assistance number that was automatically dialed from Clausen's cell phone.

### (e) Trooper Phillips

Trooper Phillips testified that he responded to a call for service in February 2019 because Sollman was seeking Salvation Army vouchers for a hotel room. After Phillips spoke with Sollman, he learned that Sollman had two Sarpy County warrants for his arrest for misdemeanor DUI and felony motor vehicle homicide. As Trooper Phillips transported Sollman to the Sarpy County jail, Sollman made statements related to the accident, including that the accident "cured him from drinking and driving."

### 3. VERDICT AND SENTENCING

Following the conclusion of the State's case, Sollman moved to dismiss counts 1 and 3 on the basis that the State had failed to present a prima facie case, which motion was overruled by the district court. Sollman then rested without presenting any evidence and renewed his motion to dismiss, which the district court again overruled.

Ultimately, the district court found Sollman guilty of all three of the charged offenses. Prior to sentencing, Sollman filed motions for new trial alleging that there was insufficient evidence to convict him and that the court failed to consider lesser-included offenses. The district court overruled those motions, finding that there was sufficient evidence to convict Sollman on all three charged offenses, and because the State met its burden beyond a reasonable doubt on count 1, the court did not need to consider lesser-included offenses.

At the sentencing hearing, the district court stated that it had considered the contents of the presentence investigation report (PSR), documentation that Sollman was 46 years old at the time of the PSR, was married, and had nine dependent children; Sollman's criminal history and "Level of Service/Case Management Inventory" (LS/CMI) scores; the comments made at sentencing; the circumstances surrounding the accident, including Sollman's intoxication level and speed; and the seriousness of the crimes committed by Sollman. The district court also noted that Sollman blamed the victim for the accident and that the court found Nowling's account of the events leading up to the accident credible. Further, the court reviewed law enforcement's accident reconstruction and calculations, which determined the accident was caused by speeding, but the court noted, "The accident was [caused by] an intoxication level more than two times the legal limit, excessive speeding and erratic driving all the way up to the point in time this occurred."

As a result of those considerations, the district court found that imprisonment was necessary to protect the public due to the substantial risk Sollman would engage in additional criminal conduct if placed on probation and that "a lesser sentence would depreciate the seriousness of the offense or promote disrespect of the law." For count 1, motor vehicle homicide, the district court sentenced Sollman to 14 to 20 years' imprisonment and a 15-year license suspension. For count 2, DUI, the district court sentenced Sollman to 60 days'

imprisonment and revoked Sollman's license for 6 months but provided that Sollman could install an ignition interlock device after 45 days. For count 3, reckless driving, the district court sentenced Sollman to 90 days' imprisonment. The sentences were ordered to be served consecutively, but the 15-year and 6-month license revocations were ordered to run concurrently. Additionally, Sollman was given credit for 378 days previously served. The district court also ordered Sollman to pay a fine of $500. Sollman has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Sollman argues the district court erred in (1) overruling his motion to dismiss at the close of evidence and finding him guilty of motor vehicle homicide (count 1), because an efficient intervening cause destroys proximate cause; (2) overruling his hearsay objection to exhibit 5; (3) finding him guilty of DUI (count 2); (4) overruling his motion to dismiss at the close of evidence and finding him guilty of reckless driving (count 3); (5) overruling his motion to suppress the statements he made to law enforcement; and (6) imposing excessive sentences.

## IV. STANDARD OF REVIEW

[1-3] A motion to dismiss at the close of all the evidence has the same legal effect as a motion for directed verdict. *State v. Combs*, 297 Neb. 422, 900 N.W.2d 473 (2017). See, also, *State v. Malone*, 26 Neb. App. 121, 917 N.W.2d 164 (2018). In determining whether a criminal defendant's motion to dismiss for insufficient evidence should be sustained, the State is entitled to have all of its relevant evidence accepted as true, the benefit of every inference that can reasonably be drawn from the evidence, and every controverted fact resolved in its favor. *State v. Canady*, 263 Neb. 552, 641 N.W.2d 43 (2002). In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *Id*.

[4] Excluding rulings under the residual hearsay exception, an appellate court reviews the factual findings underpinning a trial court's hearsay ruling for clear error and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds. See *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019).

[5] In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id.* Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *Id.*

[6-8] Evidentiary questions committed to the discretion of the trial judge, orders denying a motion for new trial, and claims of excessive sentencing are all reviewed for abuse of discretion. *State v. Dady, supra*. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. An appellate court will not disturb a sentence imposed within the statutory limits absent the trial court's abuse of discretion. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

## V. ANALYSIS

### 1. MOTION TO DISMISS AND FINDING OF GUILT ON COUNT 1

Sollman first argues that the district court erred in overruling his motion to dismiss at the close of evidence and finding him guilty of count 1, because of the doctrine of efficient intervening cause.

A motion to dismiss at the close of all the evidence has the same legal effect as a motion for directed verdict. *State v. Combs, supra*. In determining whether a criminal defendant's motion to dismiss for insufficient evidence should be sustained, the State is entitled to have all of its relevant evidence accepted as true, the benefit of every inference that can reasonably be drawn from the evidence, and every controverted fact resolved in its favor. *State v. Canady, supra*. In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *Id*.

[9-15] Sollman was charged with motor vehicle homicide, which is defined in § 28-306. Section 28-306(1) provides that "[a] person who causes the death of another unintentionally while engaged in the operation of a motor vehicle in violation of the law of the State of Nebraska or in violation of any city or village ordinance commits motor vehicle homicide." Section 28-306(3)(b) further provides:

> If the proximate cause of the death of another is the operation of a motor vehicle in violation of section 60-6,196 or 60-6,197.06, motor vehicle homicide is a Class IIA felony. The court shall, as part of the judgment of conviction, order the person not to drive any motor vehicle for any purpose for a period of at least one year and not more than fifteen years and shall order that the operator's license of such person be revoked for the same period.

Sollman argues that the State failed to prove that Sollman's actions here were the proximate cause of the victim's death. In support of that argument, he cites to *State v. Irish*, 292 Neb. 513, 520-21, 873 N.W.2d 161, 167-68 (2016), wherein the Nebraska Supreme Court set forth the requirements for establishing proximate cause in the criminal context, holding:

> The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel

in many instances. As a general matter, to say one event proximately caused another is a way of making two separate but related assertions: First, it means the former event caused the latter; second, it means that it was not just any cause, but one with a sufficient connection to the result. The idea of proximate cause, as distinct from actual cause or cause in fact, is a flexible concept that generally refers to the basic requirement that there must be some direct relation between the injury asserted and the injurious conduct alleged. A requirement of proximate cause serves to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.

Proximate causation and "but for" causation are interrelated. A "proximate cause" is a moving or effective cause or fault which, in the natural and continuous sequence, unbroken by an efficient intervening cause, produces a death or injury and without which the death or injury would not have occurred. Three basic requirements must be met in establishing proximate cause: (1) that without the misconduct, the injury would not have occurred, commonly known as the "but for" rule; (2) that the injury was a natural and probable result of the misconduct; and (3) that there was no efficient intervening cause. Criminal conduct is a proximate cause of the event if the event in question would not have occurred but for that conduct; conversely, conduct is not a proximate cause of an event if that event would have occurred without such conduct. Thus, "but for" causation is encompassed within proximate causation.

Sollman attempts to argue here that the victim's negligence in pulling out in front of Sollman's vehicle and failing to yield to him was an efficient intervening cause of the accident and the victim's death. More specifically, Sollman argues that "[b]ecause the State does not dispute the accident would not

have happened if [the victim] had not pulled out in front of . . . Sollman, the State failed to prove the absence of an efficient intervening cause, and as a result, failed to prove proximate cause." Brief for appellant at 11.

But Sollman's simplified argument misconstrues the concept of intervening cause as it relates to this record. Whereas it is true that there was evidence that the victim failed to yield the right of way to Sollman, there was also evidence that but for Sollman's excessive speed and delayed reaction to the victim's pulling out, the accident would have been avoided. Thus, there was evidence in this record that both parties' conduct, in fact, contributed to the accident here.

[16] The Nebraska Supreme Court addressed the impact of contributing factors to an accident, as it relates to proximate cause, in *State v. Irish*, 292 Neb. 513, 873 N.W.2d 161 (2016). In so doing, the court held:

> A reasonable trier of fact could find "but for" causation in this case. If [the defendant] had not been driving the pickup while under the influence, his passenger would not have been seriously injured when [he] failed to negotiate a curve and rolled the pickup, leading to the ejection of the passenger. There is a causal nexus between [his] act of driving while under the influence and the passenger's serious bodily injury; such injury did not merely occur while [he] was driving.
>
> The presence of other factors combining with [the defendant's] act of driving while under the influence does not defeat "but for" causation. [He] argues that "but for" causation cannot be established due to other considerations such as vehicle speed, road construction, failure of the passenger to wear a seatbelt, and snow and ice on the road. We find helpful the following explanation of the U.S. Supreme Court: "Thus, 'where A shoots B, who is hit and dies, we can say that A [actually] caused B's death, since but for A's conduct B would not have died.' . . . The same conclusion follows if the predicate

act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back. Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived." The other factors to which [the defendant] points may have combined with [his] act of driving to produce the result, but a reasonable trier of fact could conclude that the other factors alone would not have done so. And [his] act of driving while under the influence was an independently sufficient cause of the passenger's serious bodily injury. Thus, "but for" causation exists.

A reasonable trier of fact could also conclude that the passenger's serious bodily injury was a direct and natural result of [the defendant's] act of driving the pickup while under the influence of alcohol and that no intervening cause superseded and severed the causal link. An intervening cause supersedes and cuts off the causal link only when the intervening cause is not foreseeable. The other factors that [he] claims contributed to the accident were not efficient intervening causes, because they were foreseeable. And, as noted, there was sufficient causal connection between [his] act of driving while under the influence of alcohol and the resulting serious bodily injury to [his] passenger.

*State v. Irish*, 292 Neb. at 521-22, 873 N.W.2d at 168.

The same can be said here. A reasonable trier of fact could find "but for" causation in this case. If Sollman had not been driving nearly 20 m.p.h. over the speed limit while intoxicated, this accident could have been avoided notwithstanding the victim's failure to yield. There is a causal nexus between Sollman's act of driving while impaired at an excessive rate of speed and with delayed reaction time and this collision, which resulted in the victim's death.

A reasonable trier of fact could also conclude the victim's death was a direct and natural result of Sollman's act of driving his vehicle at an excessive rate of speed while under the influence of alcohol with limited reaction time and that no intervening cause superseded and severed the causal link.

In making that determination, we are mindful of Sollman's argument that the victim's negligence here was an efficient intervening cause which itself was the proximate cause of the accident. Sollman argues that the victim's conduct in failing to yield to Sollman severed his negligence in operating his vehicle while under the influence at an excessive rate of speed and should have resulted in the court's directing a verdict here.

[17,18] But a similar argument was made by the defendant in *Wilke v. Woodhouse Ford*, 278 Neb. 800, 774 N.W.2d 370 (2009). In addressing the doctrine of efficient intervening cause, the Nebraska Supreme Court held:

> An efficient intervening cause is new and independent conduct of a third person, which itself is a proximate cause of the injury in question and breaks the causal connection between the original conduct and the injury. The causal connection is severed when (1) the negligent actions of a third party intervene, (2) the third party had full control of the situation, (3) the third party's negligence could not have been anticipated by the defendant, and (4) the third party's negligence directly resulted in injury to the plaintiff. The doctrine that an intervening act cuts off a tort-feasor's liability comes into play only when the intervening cause is not foreseeable. But if a third party's negligence is reasonably foreseeable, then the third party's negligence is not an efficient intervening cause as a matter of law.

*Id.* at 816-17, 774 N.W.2d at 383. Applying that doctrine, like in *State v. Irish*, 292 Neb. 513, 873 N.W.2d 161 (2016), the court found there was evidence in the record a jury could find that the alleged intervening act was reasonably foreseeable, thereby precluding judgment as a matter of law on the issue.

[19,20] And more recently, in addressing the issue of foreseeability in cases such as these, the Nebraska Supreme Court held:

> "[U]nder the Restatement (Third), foreseeable risk is an element in the determination of negligence, not legal duty. In order to determine whether appropriate care was exercised, the fact finder must assess the foreseeable risk at the time of the defendant's alleged negligence. The extent of foreseeable risk depends on the specific facts of the case and cannot be usefully assessed for a category of cases; small changes in the facts may make a dramatic change in how much risk is foreseeable. Thus, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter. And if the court takes the question of negligence away from the trier of fact because reasonable minds could not differ about whether an actor exercised reasonable care (for example, because the injury was not reasonably foreseeable), then the court's decision merely reflects the one-sidedness of the facts bearing on negligence and should not be misrepresented or misunderstood as involving exemption from the ordinary duty of reasonable care."

*Latzel v. Bartek*, 288 Neb. 1, 17, 846 N.W.2d 153, 165 (2014), quoting *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010).

Taking these cases together, unless reasonable minds cannot differ, the issue of whether the victim's negligent act was foreseeable here was a question of fact for the trier of fact. This is not a case where reasonable minds could not differ. Applying a similar rationale in *Vilas v. Steavenson*, 242 Neb. 801, 496 N.W.2d 543 (1993), *overruled on other grounds, DeWester v. Watkins*, 275 Neb. 173, 745 N.W.2d 330 (2008), the Nebraska Supreme Court held that where there was no evidence in the case that the third party's negligence was not reasonably foreseeable, the district court did not err in finding

that the third party's negligence was not an efficient intervening cause. We reach the same conclusion here. The record in the instant case is devoid of evidence that Sollman could not have anticipated that the victim would misjudge his speed and enter the intersection. And the record contains evidence that Clausen came to a stop before entering the intersection, waited for two cars to pass, then proceeded into the intersection, and had Sollman been traveling at the posted speed, the accident could have been avoided. This became an issue of fact for the trier of fact in this case. In short, the record indicates evidence of a sufficient causal connection between Sollman's act of driving under the influence of alcohol and the victim's death here. See, also, *State v. Brown*, 258 Neb. 330, 603 N.W.2d 419 (1999) (victim's negligence cannot act to absolve defendant in motor vehicle homicide case unless victim's actions were sole proximate cause of accident); *State v. William*, 231 Neb. 84, 435 N.W.2d 174 (1989) (contributory negligence not defense to charge of motor vehicle homicide). Under the standards of review governing a motion to dismiss or in reviewing the sufficiency of the evidence established above, we determine the court did not err in overruling Sollman's motion to dismiss or in finding for the State on the issue of proximate cause. This first assignment of error fails.

## 2. Hearsay Objection
### to Exhibit 5

Sollman next argues that the district court erred in admitting exhibit 5 over his hearsay objection. Exhibit 5 was a medical record issued by the UNMC which contained an entry from a UNMC clinical laboratory which indicated that Sollman's blood alcohol content was .197 of a gram of alcohol per 100 milliliters of blood on February 1, 2019, following the accident. Hill testified that test and the resulting record were a component part of Sollman's medical treatment, Sollman's having been admitted as a trauma patient, which treatment includes drawing a blood sample.

[21] Sollman's counsel objected to the admission of exhibit 5 on hearsay grounds. Sollman argues that the report itself "contains assertions from some unnamed out-of-court declarant." Brief for appellant at 16. He then argues that in regard to Hill's testimony which laid foundation for the record:

> The problem with . . . Hill's testimony is she did not complete the testing on the samples taken from . . . Sollman; she was merely the phlebotomist who drew blood and then sent the sample through a zip tube. . . .
>
> . . . [T]here was no evidence in the record regarding [the] testing procedure that produced Exhibit 5. Drawing blood and sending the sample through a zip tube does not overcome the elements of hearsay to admit the lab results in evidence, and the District Court should have sustained . . . Sollman's objection to Exhibit 5.

*Id.* at 16-17. The State responds by claiming that although the record contains hearsay statements, which are out-of-court statements made by a human declarant that are offered in evidence to prove the truth of the matter asserted, see *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008), and which are not admissible without exception, statements made for purposes of medical diagnoses or treatment are excepted from the hearsay rule by Neb. Rev. Stat. § 27-803(3) (Reissue 2016). But the State further argues that even if the report is deemed hearsay,

> the State produced additional evidence of Sollman's [blood alcohol content] the night of the accident in the form of [a Douglas County sheriff's office forensic laboratory report], which is more than capable of establishing his [blood alcohol content] after the accident in a fashion more customary in DUI investigations and prosecutions.

Brief for appellee at 29.

We find the State's second argument dispositive here, so we do not reach the first. The State presented clear testimony at trial that it procured a warrant and legally determined Sollman's blood alcohol content, which evidence it offered

through the testimony of Tysor, a forensic chemist. Even Sollman's brief acknowledges that because Tysor explained that "she had a Class A permit, was familiar with [t]itle 177 [of the Nebraska Administrative Code], and testified to the various instruments and testing procedures she used[,] Sollman did not object to her testimony." Brief for appellant at 17. As such, the evidence offered by Tysor came in without objection and established that Sollmon was still over the legal limit nearly 3 hours after the accident. The State asserts this evidence adequately supports the verdict regardless of evidence from the separate test provided in exhibit 5.

In response to the evidence offered by Tysor, and the State's argument here, Sollman argues that the results of this test were taken at 9:21 p.m., nearly 3 hours after the accident, and that there were no calculations performed to estimate the metabolism of the sample back to the time of the accident. Accordingly, he argues that the evidence relating to this second test was not sufficient to support the verdict and further demonstrates how the first result created prejudicial error.

[22-24] But a similar temporal-based argument was made by the defendant in *State v. Dinslage*, 280 Neb. 659, 664, 789 N.W.2d 29, 34 (2010), in which the Nebraska Supreme Court held:

> In *State v. Kubik*, [235 Neb. 612, 456 N.W.2d 487 (1990),] we explained that the State is not required to prove a temporal nexus between the test and the defendant's alcohol level at the moment he or she was operating the vehicle. It would be an impossible burden on the State to conduct such an extrapolation when its accuracy depends on the defendant's willingness to testify and his or her honesty in reporting all relevant factors, including the time and quantity of consumption. Thus, matters of delay between driving and testing are properly viewed as going to the weight of the breath test results, rather than to the admissibility of the evidence. And a valid breath test given within a reasonable time after the accused

was stopped is probative of a violation. We speculated in *Kubik* that there might in some cases be a "delay . . . so substantial as to render the test results nonprobative of the accused's impairment or breath alcohol level while driving." But we held that a breath test given "less than 1 hour" after the defendant was stopped did not entail an unreasonable delay.

We similarly find that under the circumstances of this case, this valid blood test was obtained within a reasonable time after the motor vehicle accident which resulted in severe injuries to Sollman and the death of the victim. In so finding, we are cognizant of the facts that this accident took place at the outskirts of the Omaha, Nebraska, metropolitan area; that Sollman had to be extricated from his vehicle, "life flighted" to UNMC, and treated for injuries; and that Deputy Sanderson arrived at the scene, drafted a blood draw warrant, had it authorized by a judge, then drove to UNMC in order to locate personnel to collect the blood sample from Sollman. Under these circumstances, we cannot find the nearly 3 hours it took to obtain the blood sample pursuant to the warrant unreasonable. Further, there is no evidence in this record that Sollman, who was experiencing a serious medical condition, had consumed additional alcohol after the accident but before the blood test. The test sample, as attested by Tysor, was validly drawn and tested, and the results indicated Sollman was significantly over the legal limit nearly 3 hours after the accident. This evidence of Sollman's alcohol-based impairment was consistent with testimony which described the erratic nature in which Sollman operated his vehicle just prior to, and at the time of, the accident.

[25-29] As the Nebraska Supreme Court held in *State v. Kidder*, 299 Neb. 232, 243-45, 908 N.W.2d 1, 9-10 (2018):

Pursuant to Neb. Evid. R. 103, Neb. Rev. Stat. § 27-103(1) (Reissue 2016), "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"

When it comes to evidentiary error, this statutory authority forms the foundation for this court's harmless error jurisprudence. Generally speaking, in criminal cases, the purpose of harmless error review is to ensure convictions are not set aside "'for small errors or defects that have little, if any, likelihood of having changed the result of the trial.'"

Harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result. It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside.

When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case. In other words, harmless error review looks to the basis on which the jury actually rested its verdict. The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

In conducting this analysis, an appellate court looks to the entire record and views the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt. Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless. An additional consideration is whether the improperly admitted evidence was cumulative and tended to prove the same point as other properly admitted evidence.

Assuming without deciding that the court erred in allowing the admission of exhibit 5, which included additional

evidence that Sollman's blood alcohol level exceeded the legal limit, the admission of that evidence was simply cumulative to the properly admitted evidence that Sollman's blood alcohol level exceeded the legal limit as attested by Tysor. The record in this case affirmatively demonstrates that any error in allowing the admission of exhibit 5 was harmless. Accordingly, this assignment of error fails.

### 3. Sufficiency of Evidence on Count 2—DUI

Sollman next argues that there was insufficient evidence to convict him of DUI, in violation of § 60-6,196(1)(b). Section 60-6,196(1) provides, in pertinent part: "It shall be unlawful for any person to operate or be in the actual physical control of any motor vehicle . . . [w]hen such person has a concentration of eight-hundredths of one gram or more by weight of alcohol per one hundred milliliters of his or her blood."

[30,31] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019). When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020).

Applying this standard, the evidence reflects that following this serious accident, investigators determined Sollman to have been the operator of a vehicle traveling at an excessive rate of speed just prior to the accident and to have been driving erratically immediately prior thereto; that while being extricated from his vehicle, Sollman smelled of alcohol; that investigators found an empty bottle of alcohol in his vehicle;

and that through the use of a warrant, investigators obtained a blood sample when Sollman became reasonably available to provide it which revealed Sollman's blood alcohol level significantly exceeded the legal limit nearly 3 hours after his being involved in the accident, which resulted in the victim's death. Although Sollman argues the temporal connection involving the blood test in relation to the accident should result in a finding that the evidence here was insufficient to convict him, we have already found that such evidence was probative of Sollman's condition under these circumstances, and taking it together with all the evidence viewed in the light most favorable to the State, we hold that a rational trier of fact could have found the essential element of this crime beyond a reasonable doubt. This assignment of error fails.

### 4. Motion to Dismiss and Finding of Guilt—Wanton Disregard

Sollman next argues that there was insufficient evidence to convict him of operating a motor vehicle in such a manner as to indicate an indifferent or wanton disregard for the safety of persons or property, in violation § 60-6,213.

Without repeating the full scope of review governing sufficiency of the evidence determination cited above, we review the record to determine whether the evidence in this record is sufficient to find that a rational trier of fact could find that Sollman operated his vehicle in a manner which would indicate an indifferent or wanton disregard for the safety of persons or property, in violation of § 60-6,213. We find that it is.

Although Sollman acknowledges the evidence of his excessive speed, he argues that the speed of a defendant's vehicle alone is not, in and of itself, determinative of a violation of § 60-6,213, citing *State v. Howard*, 253 Neb. 523, 571 N.W.2d 308 (1997). But the evidence in this record was not limited to Sollman's excessive speed. It included the testimony of Nowling, who discussed the erratic nature of Sollman's conduct leading up to the accident. In relation to that testimony, Sollman argues that "Nowling never identified . . .

Sollman as the driver [of the vehicle that he observed] at any point during trial" and "Nowling testified that he was unable to see the driver's face despite the fact he observed the driver stand on the side of the road next to his car." Brief for appellant at 19-20.

Regardless of whether Nowling could not specifically identify Sollman's face, his testimony was sufficient to identify that it was Sollman's vehicle he observed driving in an erratic fashion just prior to the accident, and we will not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. The testimony of the investigators here taken together with the testimony of Nowling was sufficient for a rational trier of fact to find the essential element of this offense beyond a reasonable doubt. This assignment of error fails.

## 5. Motion to Suppress

Sollman's fifth assigned error is that the district court erred in overruling his motion to suppress the statements he made to law enforcement while in the hospital recovering from his injuries. Sollman argues that at no time prior to his conversations with Deputy Sanderson or Sergeant Percifield was he advised of his *Miranda* rights and that any incriminating statement made during those conversations should have been suppressed.

[32-38] The Nebraska Supreme Court has recognized that *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020). More specifically, the court held:

> *Miranda* requires law enforcement to give a particular set of warnings to a person in custody before interrogation, including that he or she has the right to remain silent, that any statement he or she makes may be used as evidence

against him or her, and that he or she has the right to
an attorney. These warnings are considered prerequisites
to the admissibility of any statement made by a defendant
during custodial interrogation.

   *Miranda* warnings are required only when a suspect
interrogated by the police is in custody. The ultimate
inquiry for determining whether a person is in custody is
whether there is a formal arrest or restraint on freedom
of movement of degree associated with a formal arrest.
Custody is to be determined based on how a reasonable
person in the suspect's situation would perceive his or
her circumstances. Stated another way, a seizure under
the Fourth Amendment occurs only if, in view of all
the circumstances surrounding the incident, a reasonable
person would have believed that he or she was not free
to leave.

   In considering whether a suspect is in custody for
*Miranda* purposes, relevant considerations include, but
are not limited to the location of the interaction, who
initiated the interaction, the duration of the interaction,
the type and approach of questioning, the freedom of
movement of the suspect, the duration of the interaction,
and whether the suspect was placed under arrest at the
termination of the interaction.

*State v. Benson*, 305 Neb. at 963-64, 943 N.W.2d at 439-40.

   Applying this doctrine, Sollman argues that the investigating
officers' questions here amounted to a custodial interrogation.
In furtherance of that position, Sollman argues:

      Because the District Court made a factual finding that
   officers were conducting a DUI investigation when they
   interviewed . . . Sollman at the hospital, and he had three
   broken limbs, it is clear that . . . Sollman was unable
   to leave during questioning even if he wanted to. These
   facts amount to . . . Sollman['s] being under custodial
   interrogation, just like in *Mincey v. Arizona*, 437 U.S.
   385[, 98 S. Ct. 2408, 57 L. Ed. 2d 290] (1978), where
   the defendant was in great pain while in the hospital,

and the United States Supreme Court determined he was under custodial interrogation.

Brief for appellant at 21.

Although the U.S. Supreme Court did find that an investigation of a defendant could ripen into a custodial interrogation in a hospital setting, it made that finding on facts dissimilar to the case at bar. In *Mincey v. Arizona*, 437 U.S. 385, 398-99, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), the hospitalized defendant was not only in "'unbearable'" pain, but was described as being depressed almost to the point of coma; encumbered by tubes, needles, and breathing apparatus; and in a condition so severe the Court concluded that his "statements . . . were not '"the product of a rational intellect and a free will"'" and remarked that even "[i]n this debilitated and helpless condition, [he] clearly expressed his wish not to be interrogated" by requesting a lawyer and repeatedly asking the officer to stop.

The same cannot be said here. Although the record indicates Sollman was injured and unable to leave the room without assistance, Deputy Sanderson described Sollman as "with it" and capable of carrying on a conversation. Deputy Sanderson described Sollman as being properly responsive to him and able to hold a conversation and indicated that at no time did Sollman make an effort to end the interview or express any desire to be uncooperative.

The Nebraska Supreme Court reviewed a similar factual scenario in *State v. Melton*, 239 Neb. 506, 476 N.W.2d 842 (1991). In *Melton*, a police officer engaged in multiple conversations with the defendant in a hospital following an automobile accident which resulted in the death of his passenger. At that time, police were unable to determine the driver of the vehicle, so they questioned the defendant while in the hospital as part of their ongoing investigation governing the incident. Although in a recorded interview, the defendant told investigators that his passenger had been driving, the police eventually determined that the defendant had been driving. He

later moved to suppress statements made during his interview, arguing the statements were made during a custodial interrogation and provided without *Miranda* warnings. On those facts, the court in *Melton* concluded:

> We find that [the defendant] was not in custody. He was admitted to the hospital for treatment, was not under formal arrest, and was questioned by officers during the routine course of an accident investigation. Although it is not dispositive, [the defendant] did not incriminate himself in his statement to the police at the hospital, in which statement he denied being the driver of the vehicle involved in the accident, the same position he maintained at trial.

239 Neb. at 510, 476 N.W.2d at 845.

After reviewing the record in the instant case, we likewise find that the officers' questioning him was part of their routine investigation governing this motor vehicle accident and that Sollman was not in custody. Although the record indicates Sollman could not remove himself from the room without assistance, nothing about this record suggests that Sollman's statements were not the """"product of a rational intellect and a free will"""" or that the officers' questioning or conduct here rose to the level of a custodial interrogation. See *Mincey v. Arizona*, 437 U.S. at 398. We also note that although not dispositive, Sollman's statements were likewise not incriminating, insofar as he denied drinking alcohol immediately prior to the accident. We hold that the district court did not err in overruling Sollman's motion to suppress his statements made from the hospital or admitting those same statements during the course of the trial.

### 6. EXCESSIVE SENTENCES

Sollman's final assignment of error is that the sentences imposed are excessive.

Sollman was convicted of count 1, motor vehicle homicide—DUI, a Class IIA felony; count 2, DUI, a Class W

misdemeanor; and count 3, reckless driving, a Class III misdemeanor. See, § 28-306(3)(b) (motor vehicle homicide); § 60-6,196 (DUI); § 60-6,213 (reckless driving). Sollman was sentenced to 14 to 20 years' imprisonment and a 15-year license revocation on count 1, which sentence is within the statutory sentencing range for Class IIA felonies of 0 to 20 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2018). Additionally, the court properly revoked Sollman's driver's license for a period of 15 years as is required pursuant to § 28-306(3)(b).

On count 2, the court sentenced Sollman to 60 days' imprisonment and fined him $500, which sentence is within the statutory sentencing range for Class W misdemeanors, which are punishable by a mandatory minimum of 7 days' imprisonment and a $500 fine and a maximum of 60 days' imprisonment and a $500 fine. See Neb. Rev. Stat. § 28-106 (Reissue 2016). The court also revoked Sollman's license for 6 months as required by Neb. Rev. Stat. § 60-6,197.03 (Cum. Supp. 2018).

For count 3, reckless driving, the district court sentenced Sollman to 90 days' imprisonment. See § 60-6,213. This sentence is within the statutory sentencing range for Class III misdemeanors, which are punishable by 0 to 3 months' imprisonment and/or a $500 fine. See § 28-106.

[39-41] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Montoya*, 305 Neb. 581, 941 N.W.2d 474 (2020). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* However, the

sentencing court is not limited to any mathematically applied set of factors. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Montoya, supra*.

Here, at the sentencing hearing, the district court stated that it had considered the contents of the PSR, including documentation that Sollman was 46 years old at the time of the PSR, was married, and had nine dependent children; Sollman's criminal history and LS/CMI scores; the comments made at sentencing; the circumstances surrounding the accident, including Sollman's intoxication level and speed; and the seriousness of the crimes committed by Sollman. The district court also noted that Sollman blamed the victim for the accident and that the court found Nowling's account of the events leading up to the accident credible. Further, the court reviewed law enforcement's accident reconstruction and calculations, which determined the accident was caused by speeding, but the court noted, "The accident was [caused by] an intoxication level more than two times the legal limit, excessive speeding and erratic driving all the way up to the point in time this occurred." The district court further found that imprisonment was necessary to protect the public due to the substantial risk that Sollman would engage in additional criminal conduct if placed on probation and "a lesser sentence would depreciate the seriousness of the offense or promote disrespect of the law."

The PSR indicated that Sollman's criminal history includes a conviction for theft in Indiana and charges of robbery, criminal mischief, and kidnapping in Oregon for which Sollman was fined, sentenced to 90 days' imprisonment, and given 5 years' probation. Further, Sollman's LS/CMI scores were assessed to be in the "Medium/Low risk range to reoffend" (emphasis omitted). However, the probation officer completing the

PSR noted that Sollman "does not feel [Clausen] is a victim. He regrets his action of drinking the night of [the accident], but does not feel he has done anything else wrong." Sollman's victim-blaming is evident in his defendant's statement, which set forth in pertinent part:

> I was involved in a car accident where I had been drinking. Unfortunately[, the victim] pulled out from a stop sign to turn left right in front of me when I was southbound on HWY 6 and had right away [sic]. I was seriously injured and [a]ir lifted from the scene and she sadly died.

Based upon the district court's thorough consideration of the relevant factors and the information contained in the PSR; the fact that the sentences imposed were within the relevant statutory sentencing ranges; Sollman's criminal history; his risk to reoffend; the circumstances surrounding the accident, including Sollman's intoxication level and speed; Sollman's refusal to accept responsibility for his role in the offenses and continual victim-blaming; and the seriousness of the crimes committed by Sollman which resulted in the death of the victim, we determine the sentences imposed were not an abuse of discretion.

## VI. CONCLUSION

Having considered and rejected Sollman's assigned errors, we affirm his convictions and sentences.

AFFIRMED.