IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. RIVAS VILLANUEVA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MARVIN A. RIVAS VILLANUEVA, APPELLANT.

Filed July 13, 2021.    No. A-20-706.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Timothy S. Noerrlinger for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Marvin A. Rivas Villanueva appeals his conviction for motor vehicle homicide with reckless or willful reckless driving in the district court for Lancaster County. He asserts that the trial court should have granted his motion to suppress statements and that there was insufficient evidence to support a guilty verdict. Based on the reasons that follow, we affirm.

## BACKGROUND

Rivas Villanueva was charged by information in Lancaster County District Court with motor vehicle homicide with reckless or willful reckless driving, a Class IIIA felony, in connection with an automobile accident that occurred in Lincoln, Nebraska, during the afternoon on March 29, 2019. Rivas Villanueva was driving his vehicle when he lost control and collided with three other vehicles. One of his two passengers died as a result of the accident.

- 1 -

Rivas Villanueva filed a motion to suppress statements he made to Lincoln police officers at the hospital shortly after the accident. Rivas Villanueva alleged he was in custody at the time and subjected to a custodial interrogation by law enforcement without being advised of his *Miranda* rights.

A hearing was held on Rivas Villanueva's motion to suppress. Lincoln Police Officer Krissa Knopik testified that on March 29, 2019, shortly after 2 p.m., she was asked to contact one of the drivers involved in a fatality motor vehicle accident, Rivas Villanueva, at the hospital; to ask for consent to obtain a statistical blood draw; and to take Rivas Villanueva's statement.

Prior to making contact with Rivas Villanueva, a nurse told Knopik that Rivas Villanueva had injured his right arm. The nurse also told Knopik that Rivas Villanueva had made comments that he lost control of his vehicle and was going fast at the time, approximately 65 to 70 miles per hour.

Knopik located the exam room where Rivas Villanueva was being treated and entered with Lincoln Police Officer Laura Oliphant, who recorded Knopik's conversation with Rivas Villanueva. At the time Knopik spoke with Rivas Villanueva, he was lying in the hospital bed, being treated for a broken arm, and was not medically cleared to leave. Knopik did not make any effort to exclude other people from being in the exam room when she was speaking with Rivas Villanueva. She testified that medical staff came in and out of the room during her contact with Rivas Villanueva. The exam room door was not locked after Knopik entered, Rivas Villanueva was not in handcuffs, and he had not been arrested.

Knopik testified that she viewed her role in the investigation as simply getting information for the accident report. Knopik testified that *Miranda* advisements were not given to Rivas Villanueva because he was not in custody. During the time Knopik spoke with Rivas Villanueva, he never stated he did not want to talk to her. Rivas Villanueva's mother came into the room toward the end of Knopik's interaction with Rivas Villanueva. Rivas Villanueva conversed with his mother in Spanish and Knopik did not prohibit them from speaking. Knopik was unable to understand their conversation.

Knopik began her questioning of Rivas Villanueva with an open-ended inquiry about what happened just prior to the accident. Rivas Villanueva provided a narrative response, explaining that he and two co-workers were on a break and left work in Rivas Villanueva's vehicle. Rivas Villanueva described the route he drove, which included a right turn onto O Street from 66th Street, heading west. Rivas Villanueva told Knopik he initially turned into the far right lane and then moved to the far left lane of the three available lanes. When he saw no other vehicles were in front of him, "I decided to punch it. It was stupid. Uh, last time I saw the speedometer, it was like 65 or 70 miles an hour." He explained to Knopik that he lost control of the vehicle, it began spinning, and struck multiple cars. Knopik asked follow-up questions, and the entire conversation lasted about 10 minutes. Knopik did not arrest Rivas Villanueva at the end of the interview. He was not arrested until more than 2 weeks after Knopik's contact at the hospital.

Knopik noted that during her interview with Rivas Villanueva, she was wearing plain clothes, displaying her badge of office on a lanyard, and was carrying her service weapon. Oliphant was in full police uniform with her badge of office and service weapon.

Lincoln Police Officer Jon Rennerfeldt testified that he went into the exam room where Rivas Villanueva was located toward the end of Knopik's interview to examine Rivas Villanueva

for impairment, which is common in accident investigations. Rennerfeldt was in his police uniform and displaying a badge of office. Rennerfeldt testified that Rivas Villanueva's mother was also in the room. Rennerfeldt did not speak with Rivas Villanueva's mother and he never asked her to leave the room. Rivas Villanueva was not handcuffed when Rennerfeldt entered the room and he was not under arrest. Rennerfeldt was not aware whether *Miranda* advisements had been given, and he did not give such advisements because Rivas Villanueva was not in custody, was not charged with a crime, and Rennerfeldt was only there to determine if he was impaired. Oliphant remained in the room and recorded the interaction between Rennerfeldt and Rivas Villanueva. While Rennerfeldt was in the room, Rivas Villanueva and his mother spoke to each other in Spanish. Rennerfeldt testified that Rivas Villanueva had an IV in his arm and a blood pressure cuff around his arm.

Rennerfeldt did not ask questions about the accident, but, rather, asked a series of standard questions to assess any possible impairment. He also checked Rivas Villanueva's eyes for nystagmus. Rennerfeldt concluded that Rivas Villanueva was not impaired.

During the interaction with Rennerfeldt, Rivas Villanueva spontaneously commented on the accident stating, "it was my dumb decision when I went in that left lane and just floored it cause [sic] I didn't see a car in front of me. That was the only reason all that happened." Rivas Villanueva's statement was not in response to any questioning by Rennerfeldt. Rivas Villanueva also asked Rennerfeldt what the outcome of the accident would be since he was involved in it and his friend died. Rennerfeldt responded that he did not know because he did not know any details about how the accident happened or the circumstances, and he was only there to assess if Rivas Villanueva was impaired. Rivas Villanueva never told Rennerfeldt that he did not want to talk to him and did not ask for an attorney.

The transcription of the entire audio recording of the contact between Knopik and Rivas Villanueva and Rennerfeldt and Rivas Villanueva, was offered and received into evidence without objection.

After the State concluded presenting its evidence at the motion to suppress hearing, Rivas Villanueva testified. He testified that he did not remember any names or faces of the officers that were at the hospital and did not remember talking with Knopik. He did remember being checked for impairment. He recalled being in an exam room with four to five police officers and that those officers were displaying badges and carrying service weapons. He noted he was never read his *Miranda* rights. He also claimed he would not have been able to leave the exam room if he wanted to because of his broken arm and also because he was intimidated by the numerous officers present in such a small room. Rivas Villanueva also testified that he did not tell the officers that he wanted them to leave or that he did not want to talk to them because he was intimidated by the four or five officers "circling around" him while he was being questioned.

Rivas Villanueva acknowledged his mother was in the exam room and he was able to speak with her freely. Rivas Villanueva testified that he never told his mother he thought he was in police custody and none of the officers at the accident scene told him he was under arrest. The transcription of the audio recording reflected that Rivas Villanueva's mother asked him if he was going to be arrested, and he told her that the officers were going to do an investigation and he did not know if he would be arrested. Villanueva testified that he did not remember saying this to his mother, but he agreed he could have said it.

Rivas Villanueva's mother also testified. She testified that when she arrived at the hospital, she was not allowed to go into Rivas Villanueva's exam room. She stated there were police officers and nurses telling her she could not go in "until they finished." She testified that when she was allowed in the exam room, there were three police officers in the room, but she was able to talk with Rivas Villanueva freely.

At the end of the motion to suppress hearing, the court overruled the motion. The court found, based on the totality of the circumstances, that the statements made by Rivas Villanueva were freely, voluntarily, knowingly, and intelligently made, and Rivas Villanueva was not in custody at the time he made the statements to the officers at the hospital.

A jury trial was subsequently held. The evidence established that Rivas Villanueva was traveling westbound on O Street in Lincoln when the accident happened. The collision occurred near the intersection of O Street and Lyncrest Drive. The area includes businesses, restaurants, and a shopping mall. O Street has three lanes of travel in each direction in that area. At the time of the accident, the roads were wet because it had been raining on and off most of the day.

Juan Mora was in the front passenger seat of Rivas Villanueva's vehicle at the time of the accident. Mora testified that he and Rivas Villanueva were friends and worked for the same employer. Jared Williams was in the backseat of Rivas Villanueva's vehicle and died as a result of the accident. He was Rivas Villanueva's and Mora's supervisor at work, as well as their friend. Mora testified that around 12:45 p.m. on March 29, 2019, he, Rivas Villanueva, and Williams left work for their lunch break in Rivas Villanueva's vehicle. Mora was going to show Rivas Villanueva where another friend of theirs lived.

Mora testified that he was familiar with the area of O Street and Lyncrest Drive. He described the area, specifically O Street, as probably the busiest street in Lincoln.

Mora described the route they took after they left work and stated that before they turned onto O Street, Rivas Villanueva was driving normally. He testified that once they turned onto O Street, without any warning, Rivas Villanueva "sped up out of nowhere," estimating they were traveling between 70 and 80 miles per hour. When asked to describe the acceleration, Mora stated: "So, he sped up, and then he just kept going fast, and, you know, he stepped on the gas even more." The vehicle then started swerving and shaking and at that point Mora believed Rivas Villanueva was no longer in control of the vehicle. Rivas Villanueva then completely lost control and the vehicle started spinning and collided with several vehicles.

Mora described Rivas Villanueva's vehicle as a "supercharged" sports car and noted that it was a rear-wheel drive vehicle. Mora had driven the vehicle before and was familiar with sports cars as a personal interest. He stated that Rivas Villanueva's vehicle was a "pretty fast" car, noting that it could accelerate from 0 to 60 in 4.7 seconds. Mora also testified that the tires on the vehicle were "bald" and he stated that bald tires can cause a loss of control, especially in weather conditions like those that existed the day of the accident.

Mora discussed the difference between rear-wheel drive vehicles, like Rivas Villanueva's vehicle, and front- or all-wheel drive vehicles, stating it is easier to lose control in a rear-wheel drive vehicle, and wet roads can increase that risk. Mora testified that he believed the speed of the vehicle and the bald tires caused Rivas Villanueva to lose control of the vehicle, resulting in the collision with other vehicles. Mora clarified he believed a multitude of things caused the accident, but speed was the primary factor. He testified that other factors included the weather, the condition

of the vehicle, and the amount of horsepower the vehicle had available for acceleration. Mora was asked if the vehicle was hydroplaning when it started to swerve and shake and he responded that all he knew was that Rivas Villanueva was losing control. Mora also testified when Rivas Villanueva began to accelerate, there were no other vehicles in the same lane ahead of them, and the light at Lyncrest Drive was green for westbound traffic as they approached.

Phillip Grimpo, who owns a business near the intersection where the accident occurred, testified that around 1 p.m. on March 29, 2019, he was driving his vehicle and had just turned onto O Street and was heading westbound. He testified that after turning onto O Street, "I heard a really loud car, and it came around the left side of me and took off, and I remember being really, like, shocked at how fast it was accelerating." Grimpo stated one of his employees was driving behind him and he remembered thinking, "holy smokes, did she see that . . . that guy is going to wreck because it is -- it's raining and he's going incredibly fast down O Street, like you see people go fast, but it was like -- it was ridiculous and he just shot off." As Grimpo continued down O Street, he saw Rivas Villanueva's vehicle "fishtail" and collide with traffic stopped at the stoplight at Lyncrest Drive.

Candice Coffman testified that she is familiar with the area of O Street and Lyncrest Drive and that this area is very busy during the lunch hours. She testified that just before the accident, she was in her vehicle facing eastbound and was stopped at the traffic light at O Street and Lyncrest Drive in one of two turning lanes that go into the shopping mall. While stopped at the light, Coffman observed a westbound vehicle coming very fast on O Street, and she saw it pass another car. She testified that when she saw this she thought the vehicle needed to slow down because, given the time of day on O Street, it was going too fast and she thought it was going to cause an accident. She next saw the vehicle coming sideways toward her and it collided with her vehicle. She sustained a concussion and had bruising on her chest and abdomen.

Gina Mailander testified that on March 29, 2019, at about 1 p.m., she was driving her vehicle and was stopped at the traffic light at O Street and Lyncrest Drive, facing eastbound, in the outside turn lane to go into the shopping mall. While she was stopped at the light, she saw a vehicle driving westbound on O Street lose control and travel diagonally toward her from the opposite side of the intersection. The front of her vehicle was struck by Rivas Villanueva's vehicle and it was pushed to the south side of the road. Mailander sustained injures to her left arm, both knees, and her forehead. Mailander testified that after the accident, she was approached by Rivas Villanueva and he stated, "I screwed everything up. Look at this mess I made and I probably caused my friend to die."

Knopik testified consistently with her testimony from the suppression hearing. She described what occurred during her contact with Rivas Villanueva at the hospital. Knopik testified that in response to her questions, Rivas Villanueva told her what occurred just prior to the accident, as well as how the accident itself occurred. Rivas Villanueva stated that he made a right turn onto O Street, changed lanes, began to accelerate to 65 or 70 miles per hour, lost control of the vehicle, and the vehicle began spinning.

Rennerfeldt also testified consistently with his testimony from the suppression hearing. He testified he was asked to make contact with Rivas Villanueva at the hospital to check for any impairment. Rennerfeldt described what occurred during his contact with Rivas Villanueva,

including his voluntary statements. Rennerfeldt testified that based on his evaluation, he concluded Rivas Villanueva was not impaired by any drugs or alcohol.

The State offered the audio recording of the conversations Knopik and Rennerfeldt had with Rivas Villanueva into evidence, as well as the transcription of the audio recording. Both were received into evidence.

Grant Powell, a traffic accident reconstruction investigator with the Lincoln Police Department, also testified. He testified that he arrived at the scene of the accident around 1:40 p.m. Powell described the precipitation when he arrived as a drizzle and stated that the road was wet.

Based on his investigation, Powell determined that the minimum speed of Rivas Villanueva's vehicle at the point where tire marks on the road began was 64.89 miles per hour. He explained that the vehicle was actually traveling faster than 64.89 miles per hour where the tire marks began, but it was unknown how much faster and he did not want to overestimate the speed. He noted that the speed limit on O Street where the accident occurred was 40 miles per hour.

Powell discussed the ways in which a vehicle can lose control, including excessive acceleration, which can cause the tires to lose traction with the roadway; sudden steering input, where the tires cannot maintain traction due to a sudden change in direction; and hydroplaning. He testified that a lane change falls under steering input, and a lane change could be a reason to lose control depending on how erratic the lane change is and the speed of the vehicle.

Powell further described the concept of hydroplaning, which occurs when there is a layer of moisture between a vehicle's tire and the roadway that inhibits the tire from having traction. He explained that as speed increases, the chances for hydroplaning also increase because hydroplaning tends to occur when the tread of the tire is unable to move water away from the tire fast enough.

Powell also explained that rear-wheel drive vehicles do not perform as well as other vehicles in varying road conditions. He stated that if the road is slick at all, a rear-wheel drive vehicle does not provide as much traction because there is less weight on the rear wheels, which can result in fishtailing and spinning out from the back wheels.

Powell testified that there was no pooling of water on the road that would cause concern for hydroplaning. He did acknowledge there were two witness statements he reviewed which indicated that Rivas Villanueva's vehicle had possibly hydroplaned. Powell testified that he inspected the tires on the vehicle and described three of the tires as having substantial tread and good traction, while the right rear tire had some wear on the inside. He also opined that the tires on the vehicle had sufficient tread to push water away, which meant that a higher speed would be necessary to lose control or before the vehicle would hydroplane.

Powell testified that based on his investigation, he opined that Rivas Villanueva's driving was the sole proximate cause of the accident.

A stipulation by the parties was read to the jury indicating that Williams sustained blunt force trauma injuries to his head, neck, and torso, as a result of the motor vehicle collision, and that an autopsy revealed that his cause of death was the result of blunt force injuries to his neck and torso.

After the State rested, Rivas Villanueva moved for a directed verdict, which was overruled. The defense rested without putting on any evidence. The jury found Rivas Villanueva guilty of motor vehicle homicide with reckless or willful reckless driving, and the trial court entered judgment accordingly.

A sentencing hearing followed and the court sentenced Rivas Villanueva to a term of 18 months' imprisonment, with 522 days' credit for time served, followed by 18 months' postrelease supervision.

ASSIGNMENTS OF ERROR

Rivas Villanueva assigns that the trial court erred in (1) denying his motion to suppress statements and (2) finding that there was sufficient evidence to support a guilty verdict.

STANDARD OF REVIEW

In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *State v. Johnson*, 308 Neb. 331, 953 N.W.2d 772 (2021).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020).

ANALYSIS

*Motion to Suppress Statements.*

Rivas Villanueva first assigns that the trial court erred in denying his motion to suppress statements he made to law enforcement at the hospital. He argues that he was in custody at the time and was interrogated without the benefit of *Miranda* warnings, resulting in a violation of his constitutional rights.

The Nebraska Supreme Court has recognized that *Miranda v. Arizona, supra*, prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020). More specifically, the court held:

> *Miranda* requires law enforcement to give a particular set of warnings to a person in custody before interrogation, including that he or she has the right to remain silent, that any statement he or she makes may be used as evidence against him or her, and that he or she has the right to an attorney. These warnings are considered prerequisites to the admissibility of any statement made by a defendant during custodial interrogation.
>
> *Miranda* warnings are required only when a suspect interrogated by the police is in custody. The ultimate inquiry for determining whether a person is in custody is whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest. Custody is to be determined based on how a reasonable person in the

suspect's situation would perceive his or her circumstances. Stated another way, a seizure under the Fourth Amendment occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

In considering whether a suspect is in custody for *Miranda* purposes, relevant considerations include, but are not limited to the location of the interaction, who initiated the interaction, the duration of the interaction, the type and approach of questioning, the freedom of movement of the suspect, the duration of the interaction, and whether the suspect was placed under arrest at the termination of the interaction.

*Id.* at 963-64, 943 N.W.2d at 439-40.

Rivas Villanueva argues that he was in custody for *Miranda* purposes because both officers who questioned him at the hospital were aware that he was the driver of a vehicle involved in a fatality accident; the purpose of the interview was to elicit information regarding the accident; some of the questions resulted in short answers, rather than long narrative responses; there were multiple officers in his exam room and he was unable to leave due to his broken arm and because he was connected to various medical equipment; and he was in acute pain and unable to remember the majority of the interactions with the officers at the hospital.

The Supreme Court decided a case similar to the instant case in *State v. Melton*, 239 Neb. 506, 476 N.W.2d 842 (1991). In *Melton*, a police officer engaged in multiple conversations with the defendant in a hospital following an automobile accident which resulted in the death of his passenger. At that time, police were unable to determine the driver of the vehicle, so they questioned the defendant while in the hospital as part of their ongoing investigation governing the incident. Although in a recorded interview, the defendant told investigators that his passenger had been driving, the police eventually determined that the defendant had been driving. The defendant later moved to suppress statements made during his interview, arguing the statements were made during a custodial interrogation and provided without *Miranda* warnings. On those facts, the court in *Melton* concluded:

We find that [the defendant] was not in custody. He was admitted to the hospital for treatment, was not under formal arrest, and was questioned by officers during the routine course of an accident investigation. Although it is not dispositive, [the defendant] did not incriminate himself in his statement to the police at the hospital, in which statement he denied being the driver of the vehicle involved in the accident, the same position he maintained at trial.

*Id.* at 510, 476 N.W.2d at 845.

This court also recently reviewed a factual scenario where the defendant had been interviewed in the hospital following an accident without *Miranda* warnings. In *State v. Sollman*, 29 Neb. App. 356, 953 N.W.2d 569 (2021), the defendant was taken to a hospital with injuries, including three broken ribs, following an accident caused by his erratic driving. The driver of the other vehicle died as a result of the collision. A search warrant was obtained to collect a chemical blood draw from the defendant and a police officer executed the warrant at the hospital. The next day, another police officer met with the defendant at the hospital and asked about his recollection of the accident.

Prior to trial, the defendant moved to suppress statements he made to law enforcement at the hospital because he was not advised on his *Miranda* rights and the officers' questioning amounted to a custodial interrogation. The trial court overruled his motion to suppress.

On appeal, this court affirmed, finding that the officers' questioning of the defendant was part of their routine investigation for a motor vehicle accident and that the defendant was not in custody. We found that although the record indicated the defendant could not remove himself from the room without assistance, nothing about the record suggested that the officers' questioning or conduct rose to the level of a custodial interrogation. We also noted that although not dispositive, the defendant's statements were not incriminating, insofar as he denied drinking alcohol immediately prior to the accident. We held that the district court did not err in overruling the defendant's motion to suppress his statements made from the hospital or admitting those same statements during the course of the trial.

In the present case, we conclude that the officers' questioning of Rivas Villanueva was part of their routine course of investigating a motor vehicle accident and he was not in custody. Rivas Villanueva was admitted to the hospital for treatment because he had been in an accident. Knopik was sent to interview Rivas Villanueva to find out information about the accident. Rennerfeldt spoke with Rivas Villanueva to assess whether he was impaired. At the time the officers spoke with Rivas Villanueva, neither one of them knew anything about how the accident happened and Rivas Villanueva was not a suspect of a crime, as the officers did not know if a crime had been committed.

As the trial court noted, Knopik's questioning initially began with open-ended questions, starting with "what happened?" and continuing with followup questions thereafter. Rivas Villanueva was coherent, he appeared to understand the questions, and his responses were appropriate. Further, he was not complaining of extreme pain. Knopik's interview only lasted about 10 minutes. The time Rennerfeldt spent with Rivas Villanueva was also brief and he did not ask questions about the accident; he only evaluated Rivas Villanueva for impairment.

Oliphant was the only other officer in the room during Knopik's interview, as well as when Rennerfeldt was doing his impairment evaluation. Oliphant did not question Rivas Villanueva, but only recorded the communication between him and the officers. In addition, Rivas Villanueva's mother entered the exam room while Knopik was interviewing him and medical personnel were also going in and out of the room. While his mother was in the room, he had conversations with her that were uninterrupted by police.

Although Rivas Villanueva may have not been able to remove himself from the exam room without assistance, he was never told he was under arrest, he was never told he could not leave, he was never told he had to answer the officers' questions, and he was not handcuffed. Rivas Villanueva never asked the officers to stop the questioning, never asked to leave, and never asked for an attorney. Rivas Villanueva was not arrested at the end of the interaction with Knopik or Rennerfeldt; he was not arrested until 2 weeks later.

Further, the communication between Rivas Villanueva and his mother showed that Rivas Villanueva knew he was not under arrest when being questioned by the officers. His mother asked him if he was going to be arrested and he responded that he did not know and that the officers were going to do an investigation. As the trial court found, at that point Rivas Villanueva did not believe he was in custody, nor did he believe he had been arrested.

Based upon the evidence at the suppression hearing and the totality of the circumstances, we conclude Rivas Villanueva was not subject to a custodial interrogation. Therefore, there was no violation of *Miranda*, and the trial court did not err in denying the motion to suppress.

*Sufficiency of Evidence.*

Rivas Villanueva next assigns that the trial court erred in finding there was sufficient evidence to support a guilty verdict for motor vehicle homicide with reckless or willful reckless driving. Neb. Rev. Stat. § 28-306(1) (Reissue 2016) provides: "A person who causes the death of another unintentionally while engaged in the operation of a motor vehicle in violation of the law of the State of Nebraska or in violation of any city or village ordinance commits motor vehicle homicide." Subsection (3)(a) provides that if the proximate cause of the death of another is the operation of a motor vehicle in violation of Neb. Rev. Stat. § 60-6,213 (Reissue 2010) (reckless driving) or Neb. Rev. Stat. § 60-6,214 (Reissue 2010) (willful reckless driving), motor vehicle homicide is a Class IIIA felony. Reckless driving is defined as driving in such a manner as to indicate an indifferent or wanton disregard for the safety of persons or property. § 60-6,213. Willful reckless driving is defined as driving in such a manner as to indicate a willful disregard for the safety of persons or property. § 60-6,214.

Based on the statutes above, the State had to prove, and the jury was so instructed, that Rivas Villanueva unintentionally caused Williams' death while engaged in the unlawful operation of a motor vehicle, and the proximate cause of Williams' death was Rivas Villanueva's operation of a motor vehicle in such a manner as to indicate an indifferent or wanton disregard for the safety of persons or property, or a willful disregard for the safety of persons or property. See, § 28-306(3)(a); § 60-6,213; § 60-6,214. Rivas Villanueva only contests the sufficiency of the evidence as to the reckless or willful reckless element; thus, we need not address the other elements of the offense in this appeal.

Rivas Villanueva acknowledges that the evidence establishes he was speeding at the time of the accident. However, he argues that speed alone is insufficient under Nebraska law to establish reckless or willful reckless driving. We agree.

The Supreme Court has held that speed alone does not support a conviction for reckless or willful reckless driving. See, *State v. Howard*, 253 Neb. 523, 571 N.W.2d 308 (1997); *State v. Hill*, 254 Neb. 460, 577 N.W.2d 259 (1998). However, the court has also held that speed does have a bearing on whether one was driving dangerously under the surroundings and attendant circumstances of the particular case. *State v. Howard, supra*; *State v. DiLorenzo*, 181 Neb. 59, 146 N.W.2d 791 (1966). Evidence of speed can be used as one piece of evidence to establish that a defendant drove in such a manner as to indicate an indifferent or wanton disregard for the safety of persons or property. See *State v. Howard, supra.*

In the present case, there was evidence of more than just speed that contributed to the motor vehicle accident. Rivas Villanueva was driving a rear-wheel drive, "supercharged" sports car that could accelerate from 0 to 60 in 4.7 seconds. Rivas Villanueva admitted that after changing lanes on O Street, he decided to "floor it." When Rivas Villanueva accelerated the vehicle in the left lane, he passed at least one other vehicle driven by Grimpo, who testified that Rivas Villanueva's vehicle came around his vehicle on the left side and "took off" and he was "shocked at how fast it

- 10 -

was accelerating." He further described Rivas Villanueva's speed as "ridiculous" and said "he just shot off."

Coffman also testified that she observed Rivas Villanueva's vehicle traveling "very fast" on O Street toward her and she thought he needed to slow down or he was going to cause an accident based on the amount of traffic in that area at the time.

Mora testified that when Rivas Villanueva turned onto O Street, without warning, he "sped up out of nowhere." Mora further stated, "So, he sped up, and then he just kept going fast, and you know, he stepped on the gas even more." Mora testified that he believed speed was the primary factor that caused the accident, but other factors included the weather, the condition of the vehicle, including bald tires, and the amount of horsepower the vehicle had available for acceleration.

Powell testified that excessive acceleration can cause a vehicle to lose control, as well as sudden steering input, which includes a lane change, and hydroplaning. He further testified that a lane change can be a reason for loss of control depending on how erratic the lane change is and the speed of the vehicle.

There was also evidence that the roads were wet at the time of the accident and that rear-wheel drive vehicles such as Riva Villanueva's do not perform as well in such conditions. Mora testified that it is easier to lose control in a rear-wheel drive vehicle and wet roads can increase that risk. Powell also testified that rear-wheel drive vehicles are generally unable to perform as well as other vehicles in adverse weather conditions because if the road is slick at all, a rear-wheel vehicle cannot provide as much traction, which can result in fishtailing and a loss of control.

In addition, when Knopik asked Rivas Villanueva what he thought caused him to lose control of the vehicle, he stated, "It was wet outside . . . and the car, it's just rear wheel drive, it's not all wheel drive. . . . And, since it was wet, it was slippery and I just slipped like that." Rivas Villanueva also told his mother, "I was driving very fast and lost control. I was going about 60. It was wet outside." He further stated, "Yeah, I was going and I lost control because my fucking car is rear wheel drive. I was going too fast." Rivas Villanueva's own statements show that he attributed the accident to his excessive speed, acceleration, the wet conditions on the road, and the rear-wheel drive feature of his vehicle.

In summary, the evidence shows that prior to the accident Rivas Villanueva made the decision to switch lanes, quickly accelerate, and travel at a speed at least 24 miles per hour over the speed limit. He drove his rear-wheel drive vehicle in this manner on a wet roadway, with three lanes of traffic in each direction, and on a street described as one of the busiest in Lincoln, especially during that time of day. He had two passengers in his own vehicle, and there were other people and vehicles in the area, including the one he passed and the three vehicles he collided with after losing control.

In reviewing a criminal conviction for a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020). Based on the record before us and viewing the evidence in a light most favorable to the State, there was sufficient evidence presented for a jury to conclude that Rivas Villanueva drove his vehicle in such a manner as to indicate an indifferent or wanton disregard for the safety of persons or property, or

a willful disregard for the safety of persons or property, and that his manner of driving was the proximate cause of Williams' death.

## CONCLUSION

We conclude that the trial court did not err in overruling Rivas Villanueva's motion to suppress and that there was sufficient evidence to support his conviction. Accordingly, Rivas Villanueva's conviction and sentence are affirmed.

AFFIRMED.